UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

--------------------------------------------------------------------X

ESTATE OF AMER FAKHOURY, by Micheline Elias,
Administrator,
21 Bellamy Road, Dover, New Hampshire 0382021

MICHELINE ELIAS, individually, and on behalf of
M.A.F., minor, and Z.A.F, minor,
21 Bellamy Road, Dover, New Hampshire 03820;

GUILA FAKHOURY,
21 Bellamy Road, Dover, New Hampshire 03820;

       and

AMANDA FAKHOURY,
21 Bellamy Road, Dover, New Hampshire 03820;

       Plaintiffs,

    -against-

THE ISLAMIC REPUBLIC OF IRAN,
Ministry of Foreign Affairs, Khomeini Ave. United
Nations St., Teheran, Iran;

       Defendant.

Docket no. 21-cv-_____

**COMPLAINT**

--------------------------------------------------------------------X

Plaintiffs, by their counsel, complain of the Defendants, and hereby allege for their Complaint as follows:

**INTRODUCTION**

1.    This is a civil action for wrongful death, personal injury and related torts pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602, *et seq*., brought by United States citizens whose husband and father, Amer Fakhoury, was abducted in Lebanon on September 4, 2019, and was brutally tortured by officials, employees and agents of Hezbollah, a

designated Foreign Terrorist Organization (FTO) and an instrument of the Defendants the Islamic Republic of Iran ("Iran") and Iranian Ministry of Information and Security ("MOIS"). The extreme physical abuse inflicted upon Amer Fakhoury during his imprisonment and torture by Hezbollah greatly injured his health and destroyed his immune system, resulting in the terminal disease from which he subsequently died.

## JURISDICTION AND VENUE

2.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1330-1332, 1367, 1605 note, and 1605A(a). Venue is proper in this Court pursuant to 28 U.S.C. § 1391(f)(4) and the rules of pendent venue.

3.    Personal jurisdiction over the defendants will be established once the defendants are properly served pursuant to 28 U.S.C. 1608(a). 28 U.S.C. 1330(b); *Campuzano*, DE 51, 281 F. Supp. 2d at 271-72.

## THE PARTIES

4.    Lebanese-born Amer Fakhoury was a naturalized American citizen at the time of his abduction and torture in Lebanon in September 2019 and remained a United States citizen until his death on August 18, 2020. As the result of his abduction and torture by Hezbollah, classified by the U.S. government as a Special Designated Global Terrorist (SDGT) entity, Amer Fakhoury was egregiously injured and rendered without medical attention and care, allowing his health to deteriorate to the point where his malignancy was accelerated,

5.    Plaintiff Micheline Elias, Amer Fakhoury's wife, was an American citizen in September 2019 and remains a United States citizen today. As the result of her husband's abduction, torture, and death, Plaintiff Micheline Elias experienced the loss of her husband's

society, companionship, comfort, advice, and counsel and has suffered severe mental anguish, extreme emotional distress, and solatium damages.

6.      Plaintiff M.A.F., a minor, is the daughter of Amer Fakhoury. She was an American citizen in September 2019 and remains a United States citizen today. As the result of his father's torture and murder, Plaintiff M.A.F. has experienced the loss of his father's society, companionship, comfort, advice, and counsel and has suffered severe mental anguish, extreme emotional distress, and solatium damages.

7.      Plaintiff Z.A.F. is the daughter of Amer Fakhoury. She was an American citizen in September 2019 and remains a United States citizen today. As the result of his father's torture and murder, Plaintiff Z.A.F. has experienced the loss of his father's society, companionship, comfort, advice, and counsel and has suffered severe mental anguish, extreme emotional distress, and solatium damages.

8.      Plaintiff Guila Fakhoury is the daughter of Amer Fakhoury. She was an American citizen in September 2019 and remains a United States citizen today. As the result of his father's torture and murder, Plaintiff Guila Fakhoury has experienced the loss of his father's society, companionship, comfort, advice, and counsel and has suffered severe mental anguish, extreme emotional distress, and solatium damages.

9.      Plaintiff Amanda Amer Fakhoury is the daughter of Amer Fakhoury. She was an American citizen in September 2019 and remains a United States citizen today. As the result of his father's torture and murder, Plaintiff Amanda Amer Fakhoury has experienced the loss of his father's society, companionship, comfort, advice, and counsel and has suffered severe mental anguish, extreme emotional distress, and solatium damages.

10.     Defendant Islamic Republic of Iran ("Iran"), through its officials, employees, and agents including officials of Hezbollah, a U.S. government designated Foreign Terrorist Organization ("FTO") based in Lebanon and operating around the world, intentionally ordered, directed, and caused the psychological and physical torture, abuse, of Amer Fakhoury and the resulting harm to Plaintiffs herein.

11.     Defendant Iran is a foreign state within the meaning of 28 U.S.C. § 1603 and has been continuously designated as a state sponsor of terrorism pursuant to § 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)) since 1984. Defendant Iran has been categorized by the United States Department of State as an "outlaw regime." Recently, the Department of State reported that:

> In Lebanon, Iranian support has been foundational to Hizballah since its emergence in the 1980s as the first organization to employ the widespread and regular use of suicide bombers. In addition to providing as much as $700 million in funds annually, Iran has long been one of the primary suppliers of Hizballah's military technology, enabling the group's transformation into a quasi-conventional force. This support violates UNSCR 1701, adopted in 2006, which obligates all UN Member States to prevent the sale or supply to any individual or entity in Lebanon of arms and related materiel, except those authorized by the Government of Lebanon or the United Nations Interim Force in Lebanon. As part of this larger picture, Iran has continued to support Hizballah's development of missile production facilities, as well as the group's ongoing efforts to convert its 130,000-plus rocket stockpile into precision-guided missiles. Hizballah poses a growing threat to both Lebanese and regional stability, as demonstrated in September 2019 when the group used Anti-Tank Guided Missiles (ATGWs) to target an Israeli army base and military vehicles located inside Israeli territory.

https://www.state.gov/wp-content/uploads/2020/09/Outlaw-Regime-2020-A-Chronicle-of-Irans-Destabilizing-Activity.pdf

## UNDERLYING FACTS

### A.      Background

12.      Amer Fakhoury was born on May 31, 1963, to a Lebanese Christian family in the South Lebanese town of J'daydet Marjeyoun.

13.      Amer's father, Elias Fakhoury, was a professional soldier in the Lebanese military.

14.      In 1920, following the First World War, France was given a League of Nations international mandate to administer governance in Lebanon; this continued until 1943. Under the French Mandate, a link was formally established between the religious and ethnic identity of the sectarian communities and political power in Lebanon. Lebanon's parliamentary structure provided the Christian community with a favored and disproportionate amount of political influence and power in asserting local and national leadership. The country's Muslim majority begrudged this arrangement and French control over their affairs. Many in the country opposed the pro-Western orientation of the government and sought to realign the state with other Arab regimes in the surrounding Middle East. They resented the foreign rule imposed by the world powers. Additionally, they resented the favored position of the Christian community. Lebanon, eventually, achieved independence in 1943.

15.      Following Lebanese independence, many aspects of the French Mandate influence continued to endure decades later including during the childhood of Amer Fakhoury in South Lebanon. At the time he was growing up, governance in Lebanon was formally divided up and shared between the country's traditional sectarian, ethnic and religious factions: Christians, Muslims, and Druze.

16.     Relations between the various ethnic and religious communities in Lebanon were generally cordial and pragmatic although sectarian tensions and fighting occasionally arose. Growing resentment and indignation between the communities were suppressed and the country was reasonably unified.

17.     In June 1967, following the Arab-Israeli Six-Day War, thousands of Palestinian refugees from Jordan and Syria flooded into Lebanon, disrupting the fragile political and demographic balance. Along with this influx of displaced persons, Palestine Liberation Organization ("PLO") and its various terrorist entities which had been actively fighting in 1967 and claimed to represent and lead the Palestinian people, established itself in refugee camps in South Lebanon. Sensing a weak central government in Beirut, the PLO exercised control over the Palestinian refugees often in defiance of the Lebanese government, and began to operate in South Lebanon as its armed and completely autonomous state-within-a-state.

18.     After establishing itself as one of the most powerful military forces in the country, the PLO utilized its bases in South Lebanon to launch attacks on Israel. This resulted in cross-border military retaliation from Israel. The Palestinians, primarily Sunni Muslims, also aligned themselves locally with the Muslim majority and began to disrupt and undermine internal Lebanese politics.

19.     In the 1970s sectarian tensions began to radically escalate in Lebanon tearing the fragile ethnic and religious fabric that had previously held the country together. The Lebanese Army, officially charged with maintaining control throughout the country, was poorly led, divided along sectarian lines, and highly ineffective. The decades of long-suppressed animosity and political rivalry between the traditional competing ethnic and religious factions finally simmered over and violent attacks and bitter disputes between communities began.

20.     In 1976, sectarian fighting broke out between the Muslim and Christian communities. The violence spread across the entire country. The PLO allied with the various Muslim militias in their battles against the Christians. Even though the Shiite Muslim community was not always allied with the Sunni population, they joined their Sunni countrymen in civil warfare against the Christian population. During this time, the Lebanese Army began to come apart at its seams. Many conscripted soldiers began to abandon their bases and make their way back to their towns and villages to join in the ethnic fighting, taking up arms with their clans and families along traditional sectarian lines.

21.     Beirut, once called the "Paris of the Middle East," was plunged into a bitter and devastating civil war that would last from 1976 until 1990. During the 15 years of bitter fighting, more than 120,000 Lebanese citizens would be killed and another 75,000 injured, including many innocent civilians. More than 1,000,000 Lebanese would flee the country.

22.     With the collapse of the Lebanese Army, and increasing terrorist attacks against them, the Christian community fearing for its security began to look for ways to safeguard themselves. A Christian faction within the Lebanese Army led by Major Saad Haddad split off and formed the South Lebanese Army ("SLA"). The SLA's goal was to oppose the PLO's militant attacks and to fight the growing strength and threats from Hezbollah.

23.     The SLA was aligned with, and supported by, the State of Israel. Israel viewed the SLA as invaluable allies in its struggle against the PLO and other nefarious terrorist armies operating in the region.

24.     In 1982, the Israel Defense Forces ("IDF") responded to the persistent terrorist rocket fire from the PLO into northern Israel with a full-scale incursion, the goal of which to deliver a swift strike that would cleanse South Lebanon of the rocket threat to its civilian

population. The campaign was known as "Operation Peace for the Galilee" and involved Israeli forces sweeping into Lebanon and destroying the PLO's infrastructure in and around the refugee camps that had been turned into a staging area for international terrorist operations. Initially, the IDF envisioned stopping its operation in Lebanon at just a 40-kilometer zone. As the war progressed, though, the IDF decided to advance to the outskirts of Beirut; the Lebanese capital had become the PLO's global hub and launching pad for international terror operations.

25.    The IDF would eventually retreat to a smaller security zone along Israel's northern border. This zone was patrolled by both the IDF and its allies the SLA. The Occupation of the Southern Lebanon security zone by the IDF would continue for the next 18 years.

26.    During Israel's occupation of the Southern Lebanon security zone, the IDF worked alongside the SLA to locate, apprehend, and kill terrorists that threatened the civilian populations of the area—on both sides of the border. A military jail and interrogation center, called Khiam Detention Center was set up inside an abandoned Lebanese Army barracks in Khiam, southern Lebanon. Suspected terrorists were brought to the Khiam facility for interrogations to assist in the effort to suppress the violence and terrorist attacks.

27.    Amer Fakhoury served as a member of the SLA starting in 1983 through 2000. While serving in the SLA he met his wife Plaintiff Michelin Elias. The couple was married in May 1985.

28.    In 1988, Amer was promoted to the rank of second lieutenant in the SLA and was assigned to work at the Khiam Detention Center. His position at the Khiam Facility was purely logistical. His duties included clerical and quartermaster work, supplying food and essentials to the equipment to the soldiers and prisoners stationed there. He worked at the Khiam Facility for eight years. In 1992, Amer was assigned to serve as a political analyst and writer in the local

radio station. In 1990, Amer and his father started a construction company. While in Lebanon, Amer and his wife had three children: Plaintiffs Guila Fakhoury born in June 1987; M.A.F born in 1995; and, Z.A.F. born in 1997.

29.     Following the ouster of the Shah of Iran in 1979 and the ascension of Ayatollah Khomeini and the other fundamentalist clerics to rule, the Islamic Republic of Iran invested significant financial resources to nurture a political and religious presence among the Shiites of Lebanon. This included the dispatch of emissaries that included paramilitary training officers from the Revolutionary Guard Corps. This investment resulted in the creation of Hezbollah, the Lebanese Shiite Party of God. Soon after it was founded in 1982, Hezbollah launched attacks against western targets in Beirut, including the suicide bombing of the U.S. Embassy in 1983 and the kidnapping of Americans and westerners. Hezbollah commenced a suicidal campaign targeting Israel's military presence in South Lebanon and its Christian allies determined to inflict as many casualties as possible. It reasoned that the Israeli population and public opinion was growing tired of the IDF's mounting casualties and security efforts in South Lebanon and wanted to bring Israeli troops back across the border.

30.     In 2000, a decision was reached by Israel to withdraw from South Lebanon. The IDF understood that to conduct its retreat as safely as possible, it needed to carry out a swift withdrawal. The IDF withdrawal placed the SLA and its loyal personnel in a very difficult and precarious position: without Israel, the SLA would be no match for Hezbollah. Anticipating the IDF retreat and the inevitability of revenge attacks by Hezbollah, SLA members feared for their personal safety, and the safety of their families. Hezbollah leader Sheikh Hassan Nasrallah was quoted as warning SLA members and their families that they'd be "killed in their beds as they slept." (https://youtu.be/tGcA1Dkq4dU and https://youtu.be/i6vbAi73mI4).

31.     SLA was informed of Israel's plans to withdraw from southern Lebanon and accommodations were made to permit SLA offers and soldiers and their families to withdraw and settle into communities in northern Israel. Some 10,000 Lebanese citizens would take up residence in northern Israel following the 2000 withdrawal.

32.     Hezbollah propagandized the hasty withdrawal of the IDF from south Lebanon in 2000 and celebrated the events as a monumental military achievement. The terrorist organization boasted that it was the only militant force in the Middle East capable of defeating Israel and forcing it to retreat. Hezbollah's success won its praise and admiration from neighboring Arab regimes and media, as well as throughout the Muslim world. Within Lebanon, Hezbollah was lauded as heroes that had driven a foreign army out of the country.

33.     The Islamic Republic of Iran also viewed the Israeli withdrawal from Lebanon as a military victory for itself and Hezbollah. As a result, Tehran increased its support and funding to Hezbollah and bolstered the organization's overall capabilities and reach.

34.     Iran continues today to utilize Hezbollah as a military and terrorist force to influence regional politics, to strike at its enemies, bolster its allies, disseminate its Islamic extremist ideology, and increase its control. Iran considers Hezbollah to be an instrument of its government: it carries out orders emanating from Iran and it advances Iran's geopolitical aspirations and objectives. All aspects of Hezbollah's programs and activities are coordinated and approved by Tehran.

35.     Hezbollah requires financial Iranian support: (a) to build and maintain its operational infrastructure for the planning and execution of terrorist attacks; (b) to purchase and store weapons, explosives, and other materials used by it to carry out terrorist attacks; (c) to pay,

train, transport, and shelter its terrorist operatives; and, (d) to carry out specific terrorist attacks on the global stage.

36.     In the years that followed the Israeli withdrawal, Hezbollah's influence and control within Lebanon increased. Hezbollah asserted an ever-expanding political stake in Lebanon's domestic and foreign affairs; the terrorist group's leadership established its alternative government that rivaled the official Lebanese one. Hezbollah's military capabilities exceeded the strength and capabilities of the Lebanese Armed Forces ("LAF") making it the most powerful military force in the country. As a result of numerous tragic incidents, though, along with Hezbollah's tactics of perpetrating violence and intimidation against Lebanese officials and civilians, the Shiite Party of God lost favor with most Lebanese citizens. It has repeatedly been accused by its opponents of corruption and the appropriation of governmental funds. It is widely viewed as a terrorist group controlled by its masters in Iran whose policies and goals are dictated by the interests of Tehran. The LAF and the Lebanese population are in fear and intimidation of the Shiite group's strength, weapon stockpiles, and brutality. Hezbollah representatives were elected to the Lebanese parliament and serve as ministers and senior officials. All major political decisions in Lebanon, including the appointment of its president and prime minister, require Hezbollah's agreement and approval. Today, Hezbollah, under Iran's control, is understood to be the de-facto dominant authority in Lebanon whose policies and goals usurp those advanced by its democratically elected officials. It decides crucial matters of foreign policy and must approve senior political appointments. Hezbollah asserts a powerful and malicious influence over the country's economy, banking institutions, and financial system. Many blame Hezbollah for the country's current economic collapse and paralysis; Hezbollah has been accused of being responsible for the catastrophic blast that destroyed large swathes of Beirut in the summer of

2020 and other threats to public safety. The Lebanon of today cannot be considered an independent nation and most citizens hope that Hezbollah's control will be terminated.

37.     After leaving Lebanon in 2000, Amer Fakhoury took up residence in Northern Israel with the understanding that his family would quickly join him. He recognized that they were no longer safe and could face retaliation from Hezbollah. The terrorist organization had no intention of reaching any reconciliation with the Christian community, especially with former members of the SLA. Hezbollah was determined to perpetuate the ethnic and religious divisions of the country and to pursue a policy of revenge and intimidation. Many SLA soldiers were arrested and sentenced to long prison terms by Hezbollah-controlled courts.

38.     Plaintiff Michelin Elias and their young daughter, Plaintiff Guila Fakhoury, were unable to travel to Israel to join Amer as the border between Lebanon and Israel was swiftly closed.

39.     Militants from Hezbollah began to arrive in Christian villages and towns to harass and abuse the families of the former SLA members whom they considered traitors and political opponents. The Fakhoury family was terrified and felt that their lives were in danger in Lebanon. They were determined to get out.

40.     In Israel, Amer approached the U.S. Embassy in Tel Aviv and secured a visa to the United States. In Lebanon, Plaintiff Michelin Elias visited the U.S. Embassy in Beirut and applied for and was granted a visa for herself and her children to the United States.

41.     In June 2001, Amer arrived in Methuen, Massachusetts. In July 2001, his wife and daughters joined him to start a new life in the United States. Plaintiffs have lived in the New England area ever since. Over the years. Amer worked at various jobs to support his family and

begin the American dream. In 2003, he purchased a gas station; in 2005, he opened a successful Middle Eastern restaurant in Dover, New Hampshire.

42.     In 2011, the Parliament of Lebanon passed an amnesty act that would allow for the return and non-prosecution of former Lebanese citizens who had served in the SLA. Lebanese President Michele Aoun also called for former SLA veterans to return home without fear of prosecution. Fakhoury had become an advocate for a better Lebanon through ethnic and religious reconciliation and was in touch with senior staffers inside Aoun's office. Fakhoury even met with Aoun during a state visit by the Lebanese President to Boston, Massachusetts.

**B.     Amer Kakhoury's Abduction and Torture in Lebanon**

43.     Amer Fakhoury was naturalized in the United States 2019, and he immediately began exploring the possibility of returning to Lebanon for a visit. He had never been back to the country of his birth since he left 19 years earlier, and wanted to visit his remaining family members, as well as the graves of his parents.

44.     Amer Fakhoury approached the United States Department of State and inquired whether he would face any danger from the Lebanese government should he return to Lebanon. The Department of State informed him that he had no cause for concern. He also inquired of the Lebanese government which similarly assured him that he was not being sought by any authorities and could visit freely. Amer was also in communications with Brigadier-General Elias Yousef, a member of the Aoun's presidential office, who assured him that it was safe for him and his family to visit Lebanon.

45.     With these assurances Amer Fakhoury planned a return trip. He arrived in Beirut on September 4, 2019, along with his wife and two of his daughters for what was supposed to be a routine family visit.

46.     Upon reaching passport control at Beirut International Airport ("BEY"), a security official informed Amer that he needed to hold on to his U.S. passport for a "routine" security check and that he'd be able to retrieve that document one week later. Amer Fakhoury was alarmed and checked with Brigadier-General Elias Yousef, and was assured that this was part of standard operating procedure,

47.     On September 11, 2019, al-Akhbar, the Hezbollah controlled newspaper, published a front-page story falsely accusing Amer Fakhoury of playing a role in the torture of inmates at Khiam prison. The article labeled him the "Butcher of Khiam," and demanded his arrest and prosecution. The article "coincidentally" coincided with Fakhoury's return to Lebanon, as well as the onset of the Shiite Muslim holiday of Ashura. Following the publication of the article, there were violent Hezbollah demonstrations throughout Beirut, including outside the offices of the government's various agencies.

48.     On September 12, 2019, just as he was instructed to do, Amer Fakhoury returned to the Beirut offices of the General Directorate of General Security (Lebanon's internal security and counterintelligence agency) to retrieve his passport and was immediately arrested and taken into custody. There was no due process offered; he was not allowed to contact the U.S. Embassy in Beirut even though, as a U.S. citizen, such notification is standard protocol.

49.     Behind the closed door of the secret police facility, he was subjected to psychological and physical torture. He was led through a corridor where prisoners, some as young as fourteen, were standing with their faces to the wall and hands secured with cuffs. The security personnel made Fakhoury watch as they beat the prisoners and they laughed when the detainees, not allowed to use the bathroom, relieved themselves where they stood as the guards mocked and abused them.

50.     Amer Fakhoury was isolated for hours inside an interrogation room and subjected to verbal abuse; he was brutally struck by numerous inquisitors. The men who questioned Fakhoury wore civilian clothing, were not in uniform and did not wear any form of identification or insignias on them, making it appear as if they were members of Hezbollah. A wretched and suffocating black sack was placed over Amer Fakhoury's head while as many as ten men took turns beating him.

51.     Fakhoury was threatened with execution unless he signed a declaration acknowledging guilt in the type of past crimes that were stipulated in the al-Akhbar article. A gun was placed to his head on numerous occasions to coerce a confession from him. Fakhoury resisted the threats. His inquisitors told him that unless he cooperated, the men would release him to the crowd of Hezbollah supporters that had been summoned to a protest outside the headquarters as a result of the article about him in al-Akhbar, and that the angry crowd would "tear him apart."

52.     The men who beat and tortured Amer Fakhoury repeatedly threatened to send him on a plane to Tehran in the Islamic Republic of Iran, where he would be a true hostage and prisoner. Hezbollah initiated the kidnapping of Western hostages in the past, including many Americans (including journalists) as well as the murders of others (including William F. Buckley, the CIA Station Chief, and William R. Higgins, a U.S. Marine Corps colonel assigned to United Nations peacekeepers). Hezbollah has also kidnapped and murdered Israeli soldiers in violation of international boundaries and international law, often holding the corpses of the dead combatants as hostages to extract concessions; these actions have on more than one occasion resulted in military action, and even a war (summer 2006), that resulted in the deaths of thousands of innocent people. Amer Fakhoury knew that Hezbollah controlled Beirut

International Airport and the roadways in the Beka'a Valley that led to Syria and Hezbollah could easily smuggle him to Iran never to be heard from again. Amer was dreadfully afraid of being taken to Iran and throughout his entire abduction he lived in fear that at any moment he would be placed on a plane bound for Tehran. Every time he was approached by his captors, Amer panicked, horrified that he was going to be transported to Iran.

53.     Each unsuccessful attempt to get him to sign the document resulted in harsher beatings. The document was a confession to allegations that had been concocted inside the ranks of the Hezbollah-controlled security services and judiciary based on unnamed witnesses relying on rumors and invented hearsay.

54.     Plaintiff Micheline Elias, concerned that something sinister had happened to her husband after he failed to emerge from the security service headquarters, contacted the U.S. Embassy and alerted them of her husband's disappearance. The embassy contacted the General Directorate of General Security seeking the whereabouts of Amer Fakhoury and was told that "he was not in their custody." Twenty-four hours later, though, the General Directorate of General Security, commanded by Major-General Abbas Ibrahim, a Shiite from southern Lebanon near the city of Sidon, admitted that Amer Fakhoury was in its custody.

55.     After admitting that Amer Fakhoury was, indeed, their prisoner, the General Directorate of General Security moved the badly beaten prisoner who was now in urgent need of medical attention. Amer Fakhoury was then taken to an underground cell and held there for twelve hours. The only water he was given to drink was brown filthy water in the toilet. The next day, he was beaten, blindfolded, and taken by van to a Lebanese military prison.

56.     Amer Fakhoury was held in a military high-security prison for three months even though no formal charges had been presented against him. He was captive in deplorable

conditions, often in solitary confinement, and without the benefit of proper nutrition or medical evaluation. The beatings he endured resulted in fractured ribs; Amer Fakhoury complained of crippling abdominal pains throughout his incarceration, though was denied any medication to alleviate the symptoms and he never received medical attention of any kind.

57.     Plaintiff Micheline Elias and the Fakhoury family retained a local Lebanese attorney to assist them in ascertaining the whereabouts and condition of Amer Fakhoury, but it is believed that this lawyer was not working in the family's interests and undertook no steps to free him. The Plaintiffs contacted the U.S. Department of State for assistance and asked their congressional representation for intervention. The effort to assist Amer Fakhoury and his family was bipartisan and led by Senator Jeanne Shaheen (D-New Hampshire) and Senator Ted Cruz (R-Texas). The Fakhoury family also appeared on various media outlets, including Fox News, giving interviews to raise awareness as to the predicament that Amer Fakhoury was in, and for political pressure to be applied on the Lebanese government to secure his release. https://www.foxnews.com/us/us-citizen-imprisoned-lebanon-pleads-for-release.

58.     The Fakhoury family hired an international lawyer to work on securing Amer Fakhoury's release. After three months inside the LAF Prison facility and with his health rapidly collapsing, Amer Fakhoury was moved to a LAF military hospital. He was in dire condition and a doctor diagnosed him with stage four lymphoma. His condition was accelerated by Epstein-Barr Virus that he contracted as a result of the relentless beatings and unsanitary conditions he was subjected to during his captivity, and his medical situation going untreated for so many months.

59.     It became evident to Plaintiff Micheline Elias and the Fakhoury family that Amer Fakhoury was being used as a pawn by Hezbollah to extract a prisoner swap with the U.S.

government. Major-General Abbas Ibrahim and his office were used to negotiate Amer Fakhoury's release with various agencies of the U.S. government. The Lebanese security services falsely claimed that Amer Fakhoury was a citizen of the State of Israel, that he held an Israeli passport, and that he was a spy for Israel's intelligence services—charges that were baseless and wholeheartedly denied by Amer Fakhoury.

60.     In March 2020, following lengthy negotiations and the American government's intervention, the Lebanese Government ordered Amer Fakhoury released from the security wing of the military hospital and he was transferred to the care of the U.S. Embassy in Beirut. On March 19, 2020, a U.S. Marine Corps Osprey vertical takeoff aircraft lifted off from the grounds of the U.S. Embassy, flying Amer Fakhoury to freedom.

61.     Once Amer Fakhoury was released to the care of the U.S. Embassy, the Lebanese Supreme Court announced that it was dropping all charges against him, citing that the accusations were unfounded and based solely on rumor. Hezbollah condemned Amer's release and blamed the American government for freeing someone they deemed their enemy.

62.     On June 11, 2020, several months following Amer Fakhoury's return to his family and his home in New England, the U.S. government released Kassim Tajideen, a Lebanese national held by the U.S. Bureau of Prisons for his role in financing Hezbollah terror operations around the world. The negotiations for Tajideen's release were once again handled by Major-General Abbas Ibrahim. Hezbollah, which has a "wing" in the intelligence service, was involved in all aspects of the unlawful incarceration of Amer Fakhoury, as well as the quid-pro-quo prisoner exchange that secured Amer Fakhoury's release.

63.     Amer Fakhoury returned to the United States a broken man. His cancer was exacerbated by Autoimmune HLH Syndrome. He also suffered from severe Post-Traumatic

Stress Disorder ("PTSD"). For months following his release he would wake up in the middle of the night trembling screaming "they are coming for me" and "please don't hit me." If his body had not been so strong before his ordeal began, Plaintiff Guila Fakhoury assessed, "he would have died long before he was freed from prison."

64.     Amer Fakhoury's abduction, torture and abuse at the hands of Hezbollah had badly and irreparably damaged his health. Despite all medical efforts he was too weakened from the ordeal to recover. Amer passed away on August 17, 2020.

## C.     The Islamic Republic of Iran

65.     Since 1979 and during the period relevant to this suit, defendant Iran has continuously been governed by a militant Islamic regime which believes that Islam should be the sole world religion, that all non-Islamic nations and peoples should become Islamic and be destroyed if they refuse to do so, and that the Islamic nations, led by Iran, should rule the world exclusively.

66.     Since 1979 and during the period relevant to this suit Iran has been and remains, as a matter of official policy, extremely hostile to the United States (which Iran terms "the Great Satan") and to its closest ally in the Middle East, the State of Israel (which Iran terms "the Little Satan").

67.     Since 1979 and during the period relevant to this suit it has been the continuous and official policy and goal of Iran:

   a.   To spread its influence and control throughout the Middle East;

   b.   To weaken, harm and undermine the United States militarily, economically and politically;

    c.   To bring about and cause the eradication of the State of Israel, the closest ally of the United States in the Middle East, and its replacement with an Islamic state; and

    d.   To bring about and cause the murder and/or expulsion of the Jewish residents of the State of Israel.

68.    The policy and goals described in the previous paragraph are referred to collectively hereinafter as "Iran's Policy and Goals."

69.    Iran is a highly ideological and authoritarian state that does not tolerate dissent and all political subdivisions of the Iranian government, all agencies and instrumentalities of Iran and all corporations controlled or directly or indirectly owned by Iran therefore support, and seek to advance the policies and goals of Iran, including Iran's Policy and Goals.

70.    Since 1979 and during the period relevant to this suit, it has been the continuous and official policy of Iran to use terrorism to achieve Iran's Policy and Goals. Specifically, since 1979 and during the period relevant to this suit, it has been the continuous and official policy of Iran to use terrorism (a) spread its influence and control, and (b) to intimidate and influence the United States government and public and thereby to weaken, harm and undermine the United States militarily, economically and politically.

71.    In order to carry out and achieve Iran's Policy and Goals using terrorism, Iran established the Hezbollah terrorist organization in 1982. Since 1982 and until the present day, Hezbollah has been controlled, funded and operated by Iran. Since 1982 and until the present day, Iran has used Hezbollah to carry out thousands of terrorist attacks in which hundreds of innocent victims have been murdered and thousands more maimed, and Hezbollah has engaged

in the practice of kidnapping and torturing persons whom they believe can be used to further their agenda.

72.     In 1982 Iran and Hezbollah entered into an agreement, that remains in force until today, pursuant to which Hezbollah undertook to carry out acts of terrorism against American and Israeli targets, and in return Iran undertook to provide Hezbollah with financial and other material support to carry out such terrorist attacks ("Hezbollah Agreement").

73.     The courts of the United States have issued many decisions finding Iran civilly liable for terrorist attacks carried out by Hezbollah in which U.S. citizens were murdered or harmed. The District Court for the District of Columbia has found that "Hezbollah is an Iranian proxy organization, controlled, funded and operated by Iran … Iran's control over Hezbollah is so far-reaching that [the federal courts have] repeatedly held Iran vicariously liable, under the doctrine of respondeat superior, for actions of Hezbollah." *Stern v. Islamic Republic of Iran*, 271 F.Supp.2d 286, 292 (D.D.C. 2003). Moreover, the District Court for the District of Columbia found that Iran is liable under FSIA § 1605A for the very same Hezbollah Rocket Barrage that is at issue here. *See Kaplan v. Central Bank of Iran*, 55 F. Supp. 3d 189, 197 (D.D.C. 2014) ("With respect to the rocket attacks, the Court finds that Iran assisted Hezbollah….most generally by providing the funds for the assistance…").

## D.     Hezbollah

74.     Hezbollah has been designated by the United States Government as a Specially Designated Terrorist ("SDT") continuously since 1995, as a Foreign Terrorist Organization ("FTO") continuously since 1997, and as a Specially Designated Global Terrorist ("SDGT") continuously since 2001.

75.     Hezbollah routinely operates within civilian populations, using civilians as human shields and/or deliberately targeting civilians.

76.     Support for Hezbollah, even in the form of funds transfers, "has no legitimate function that the United States recognizes." *Lelchook v. Commerzbank AG*, 2011 WL 4087448 (S.D.N.Y. 2011).

**E.     Iran's Provision of Funding to Hezbollah**

77.     Hezbollah requires financial support: (a) in order to build and maintain its operational infrastructure for the planning and execution of terrorist attacks; (b) in order to purchase and store weapons, explosives and other materiel used by it to carry out terrorist attacks; (c) in order to pay, train, transport and shelter its terrorist operatives; and (d) in order to carry out specific terrorist attacks.

78.     Over the past decades, as part of their campaign to carry out Iran's Policy and Goals, the defendants herein provided Hezbollah with over hundreds of millions of dollars in financial support (hereinafter: "Defendants' Transfer of Funds to Hezbollah") with the specific intent and purpose of facilitating, enabling and causing Hezbollah to carry out terrorist attacks against American and Israeli targets in order to advance Iran's Policy and Goals. Defendants' Transfer of Funds to Hezbollah was carried out by defendants with the specific intent and purpose of (a) intimidating and influencing the United States government and public and thereby weakening, harming and undermining the United States militarily, economically and politically and (b) intimidating and influencing the Israeli government and public and thereby bringing about the eventual eradication of the State of Israel and its replacement with an Islamic state and the murder and/or expulsion of the Jewish residents of the State of Israel.

79.     But for Iran's Transfer of Funds to Hezbollah, Hezbollah's ability (a) to build and maintain its operational infrastructure for the planning and execution of terrorist attacks; (b) to purchase and store weapons, explosives and other materiel used by it to carry out terrorist attacks; (c) to pay, train, transport and shelter its terrorist operatives; and (d) to carry out specific terrorist attacks, include and harmed the plaintiffs herein, would have been severely crippled and limited.

80.     Iran gave substantial aid, assistance and encouragement to Hezbollah and provided massive financial support to Hezbollah, and thereby aided and abetted Hezbollah, all with the specific intention of causing and facilitating the commission of acts of kidnapping, torture, extrajudicial killing and international terrorism by Hezbollah in furtherance of Iran's Policy and Goals, including the harm caused to Plaintiffs herein. Iran did so with actual knowledge that Hezbollah had killed and injured numerous U.S. and other civilians in terrorist attacks and with the knowledge and specific intent that additional U.S. and other innocent civilians would be killed and/or injured as a result of their aiding, abetting and provision of material support and resources to Hezbollah.

**FIRST CLAIM FOR RELIEF**

**FOR DAMAGES UNDER 28 U.S.C. §1605A(c)**

81.     The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

82.     Defendant Iran, through the officials, employees, and agents of its instrumentality Hezbollah including, intentionally ordered, directed, and caused the torture and subsequent death of Amer Fakhoury.

83.     Hezbollah's treatment of Amer Fakhoury, acting as agent for Defendant Iran, constituted torture within the meaning of 28 U.S.C. § 1605A.

84.     Hezbollah's abduction and abuse of Amer Fakhoury, acting as agent for Defendant Iran, constituted an extrajudicial kidnapping and torture within the meaning of 28 U.S.C. § 1605A.

85.     Iran is a foreign state that since 1984 has continuously been designated as a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A.

86.     The defendants provided material support and resources to Hamas, within the meaning of 28 U.S.C. § 1605A, which caused and facilitated the Terrorist Attack.

87.     The Terrorist Attack did not occur within Iranian territory.

88.     Plaintiff's decedent and Plaintiffs suffered severe economic, physical, psychological, emotional and other personal injuries as a result of the kidnapping and torture of Amer Fakhoury, including: conscious pain and suffering; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; loss of solatium; and pecuniary and economic loss, including loss of income and financial support.

89.     The maiming and injury of Diana Campuzano, Avi Elishis, and Gregg Salzman caused the plaintiffs severe injury, including: pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

90.     The plaintiffs are all U.S. citizens or U.S. nationals.

91.     As a direct and proximate result of the conduct of the defendants, plaintiffs suffered the injuries and harm described herein.

92.     Defenant Iran is therefore liable under 28 USC 1605A(c) for the full amount of Plaintiffs' damages.

93.     The conduct of the defendants was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

## SECOND CLAIM FOR RELIEF

### FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

94.     The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

95.     Hezbollah, acting as agent for Defendant Iran, subjected Amer Fakhoury to severe physical injury and risk of death.

96.     The aforementioned conduct was willful, outrageous and dangerous to human life, and violates applicable criminal law, all international standards of civilized human conduct and common decency.

97.     Upon learning of the fate suffered by Amer Fakhoury, and upon living through the aftermath, Plaintiffs suffered severe emotional distress in worrying about their family member and/or not knowing the condition or whereabouts of that family member.

98.     Defendant intended to, and did in fact, terrorize Plaintiffs, and cause them egregious emotional distress. As a result and by reason of the aforementioned conduct, Plaintiffs have suffered and will continue to suffer terror, severe mental anguish, bereavement and grief, and injury to their feelings.

99.     Defendant Iran is therefore jointly and severally liable for the full amount of plaintiffs' damages.

100.    The conduct of the defendants was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

### THIRD CLAIM FOR RELIEF

### FOR DAMAGES UNDER 28 U.S.C. §1605A(d)

101.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

102.    The conduct of Defendant Iran caused the decedent and Plaintiffs loss of property and financial loss, including loss of future income and loss of financial support.

103.    Defendants Iran and CBI are therefore jointly and severally liable under 28 U.S.C. § 1605A(d) for the full amount of the financial damages caused to the decedent and the plaintiffs.

### FOURTH CLAIM FOR RELIEF

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Under the Law of the State of Massachusetts, Maine,
### and New Hampshire, and any other relevant jurisdiction)

104.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

105.    Defendant's conduct was willful, extreme, outrageous and dangerous to human life, and violates applicable criminal law, all international standards of civilized human conduct and common decency and is utterly intolerable in a civilized community.

106.    Defendant intended to, and did in fact, terrorize Plaintiffs the wife and children of the decedent, and cause them egregious emotional distress. As a result and by reason of the conduct alleged herein, which was caused by the actions of defendants described herein,

Plaintiffs have suffered and will continue to suffer terror, severe mental anguish, bereavement and grief, and injury to their feelings.

107.    Defendants are therefore jointly and severally liable for the full amount of plaintiffs' damages.

108.    The conduct of the defendants was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

## **JURY DEMAND**

Plaintiffs demand trial by jury of all issues legally triable to a jury.

## **PRAYER FOR RELIEF**

**WHEREFORE**, plaintiffs demand judgment as follows:

(a)    Judgment against all defendants, jointly and severally, for compensatory damages in an amount to be determined at trial;

(b)    Judgment against all defendants, jointly and severally, for punitive damages in an amount to be determined at trial;

(c)    Plaintiffs' costs and expenses;

(d)    Plaintiffs' attorneys fees;

(e)    Prejudgment interest to the extent allowed by law; and

(f)    Such other and further relief as the Court finds just and proper under the circumstances.

Dated: Brooklyn, New York
        May 4, 2021

Respectfully submitted,

THE BERKMAN LAW OFFICE, LLC
*Attorneys for Plaintiffs*

By:_____
        Robert J. Tolchin
        (D.C. Bar #NY0088)

111 Livingston Street, Suite 1928
Brooklyn, New York 11201
(718) 855-3627