David C. Deal
The Law Office of David C. Deal, P.L.C.
P.O. Box 1042
Crozet, VA 22932
Tel: (434) 233-2727
Email: david@daviddeal.com

David D. Lin, Esq.
(*pro hac vice* forthcoming)
Justin Mercer, Esq.
(*pro hac vice* forthcoming)
Lewis & Lin, LLC
81 Prospect Street, Suite 8001
Brooklyn, NY 11201
Tel: (718) 243-9323
Email: David@iLawco.com
          Justin@iLawco.com

*Counsel for Proposed Intervenor*
*the General Directorate of General Security*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| ESTATE OF AMER FAKHOURY, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> THE ISLAMIC REPUBLIC OF IRAN, <br><br> *Defendant*. | Case No. 1:21-cv-01218-JDB |

**Proposed Intervenor the General Directorate of General Security of Lebanon's**
**Motion for Limited Intervention and to Strike**

Dated: November 29, 2021

**TABLE OF CONTENTS**

TABLE OF AUTHORTIES ............................................................................................................iii
INTRODUCTION .......................................................................................................................... 1
BACKGROUND FACTS .............................................................................................................. 3
ARGUMENT .................................................................................................................................. 3
   A.   Although it is not required to do so, GDGS satisfies the requirements for limited intervention to protect injury to its reputation ................................................................... 3
   B.   The Complaint asserts false, scandalous, impertinent, and highly damaging allegations against GDGS that should be stricken ................................................................................. 5
CONCLUSION............................................................................................................................. 11

# **TABLE OF AUTHORTIES**

**Cases**

*Estate of Ungar v. Palestinian Auth.*, No. 00 CV-105L, 2003 WL 22012475 (D.R.I. Aug. 4, 2003) .................................................................................................................................. 10

*Estate of Ungar v. Palestinian Auth.*, No. 00-105 L, 2003 WL 21076981 (D.R.I. Apr. 18, 2003), *aff'd*, No. 00 CV-105L, 2003 WL 22012475 (D.R.I. Aug. 4, 2003) ........................................ 11

*In re 2TheMart.com, Inc. Sec. Litig.*, 114 F. Supp. 2d 955 (C.D. Cal.2000) ................................. 5

*Jane Doe 1 v. United States*, No. 08-CV-80736-KAM, 2015 WL 11254692 (S.D. Fla. Apr. 7, 2015) ............................................................................................................................... 3, 6

*Larouche v. Dep't of the Treasury*, No. 91-1655, 2000 WL 805214 (D.D.C. Mar. 31, 2000) ....... 5

*Penthouse Int'l, Ltd. v. Playboy Enterprises, Inc.*, 663 F.2d 371 (2d Cir. 1981) ........................... 3

*Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002) ................ 7, 9

*Radmanesh v. Gov't of Islamic Republic of Iran*, No. 17-CV-1708 (GMH), 2019 WL 1787615 (D.D.C. Apr. 24, 2019), *aff'd sub nom. Radmanesh v. Islamic Republic of Iran*, 6 F.4th 1338 (D.C. Cir. 2021) ....................................................................................................................... 7

*Sackman v. Liggett Grp., Inc.*, 167 F.R.D. 6 (E.D.N.Y. 1996) .................................................. 3, 4

*Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230 (D.C. Cir. 2003) ........... 7, 9

*Wiggins v. Philip Morris, Inc.*, 853 F. Supp. 457 (D.D.C.1994) ................................................... 5

**Statutes**

28 U.S.C. § 1605A ......................................................................................................................... 6

**Rules**

Fed. R. Civ. P. 12(f) ............................................................................................................ 2, 3, 11

Fed. R. Civ. P. 24 ...................................................................................................................... 3, 4

The General Directorate of General Security of Lebanon ("GDGS" or "General Directorate"), a nonparty in the above-captioned action by and through its attorneys, hereby move this Court for an Order granting leave to intervene pursuant to Fed. R. Civ. P. 24 for the limited purpose of moving to strike the allegations made against it in the complaint filed herein (at paragraphs 48-55, 62), pursuant to Fed. R. Civ. P. 12(f) on the grounds that they are false, impertinent and scandalous. For the reasons set forth in the Statement of Points and Authorities below, GDGS requests that the instant motion be granted.

Pursuant to LCvR 7(m), counsel for GDGS conferred with counsel for Plaintiffs, Richard Tolchin, Esq. on November 24 and 29, 2021 in good faith regarding the anticipated motion. As a result of those discussions, counsel for Plaintiffs indicated that they oppose the requested relief.

## STATEMENT OF POINTS AND AUTHORITIES

## INTRODUCTION

The General Directorate of General Security of Lebanon ("GDGS" or "General Directorate"), a nonparty in the above-captioned action, is the victim of scandalous, immaterial, and impertinent allegations made in Plaintiffs' complaint, which seeks retribution from Iran under the Foreign Sovereign Immunities Act ("FSIA"). GDGS is an apolitical, executive agency in Lebanon, whose role and functions are akin to the U.S. Department of Homeland Security. It is an intelligence agency that, *inter alia*, monitors and secures the country's borders, distributes and reviews passports and visas, and conducts preliminary investigations related to duties.

The objectionable provisions of the Complaint (paragraphs 48-55, 62) concern GDGS and its general director, Major General Abbas Ibrahim ("Director Ibrahim"), a decorated and award-winning diplomat. According to those provisions, GDGS and Director Ibrahim somehow are connected in the "kidnapping," "torture," and "extrajudicial killing" of Amer Fakhoury ("Mr.

Fakhoury"), a Lebanese expatriate and accused military felon who had been the subject of legal, judicial, and security prosecutions in Lebanon and who traveled to Lebanon for the first time in twenty years with a brand-new U.S. passport. To be clear, these allegations are demonstrably false and serve no purpose but to tarnish the stellar reputations of GDGS and Director Ibrahim. More crucially, the allegations regarding GDGS have no relevance to the present action, which concerns *Iran's* alleged directing, aiding, and abetting of terror activities of Hezbollah in Lebanon and seeks to hold *Iran* responsible for whatever happened to Mr. Fakhoury while he was in Lebanon.

Plaintiffs filed suit under FSIA's terrorism exception to sovereign immunity, seeking to hold Iran (and only Iran) liable for conduct by two unrelated Lebanese entities, GDGS (who investigated Mr. Fakhoury for less than one day) and a Lebanese military prison (where Mr. Fakhoury was confined for several months), which Plaintiffs allege were "Hezbollah-backed" and amounted to hostage-taking, torture and killing of Mr. Fakhoury. However, Mr. Fakhoury died of lymphatic cancer, *in the United States*, months after his release and return from abroad. Moreover, the routine, limited, official, and ministerial functions of GDGS regarding its investigation of Mr. Fakhoury's attempted re-entry into Lebanon in 2019, while false, do not rise to the level of hostage-taking, torture or killing under the FSIA.

Whether or not the Court permits GDGS to intervene for purposes of this motion, the Court may strike immaterial and completely unrelated allegations on its own. Here, the Plaintiffs' allegations concerning GDGS accuse it of serious crimes and acting as agents of designated terrorist organizations. Not only are these allegations categorically false, they should be stricken pursuant to Fed. R. Civ. P. 12(f) because they have nothing to do with whether Iran violated FSIA as it relates to Plaintiffs. These are the issues to be adjudicated by the Court in the

underlying lawsuit (not anything to do with GDGS), and it is clear the attacks against GDGS and Director Ibrahim were included for reasons totally unrelated to the merits of the case.

## BACKGROUND FACTS

The General Directorate presumes the Court's familiarity with the allegations from Plaintiffs' complaint.

## ARGUMENT

### A. Although it is not required to do so, GDGS satisfies the requirements for limited intervention to protect injury to its reputation

The Court may strike immaterial and unrelated allegations in a complaint on its own accord under Fed. R. Civ. P. Rule 12(f). Additionally, GDGS may also seek such relief by moving to intervene under Rule 24. Under the circumstances of this case—where Plaintiffs' immaterial claims cause reputational harm to GDGS—limited intervention is appropriate.

Intervention as of right is appropriate, pursuant to Fed. R. Civ. P. 24(a)(2), where the party seeking to intervene claims an interest related to the property or transaction that is the subject of the action, where the disposition of the action may impair or impede the movant's ability to protect that interest, and where the movant's rights are not adequately protected by the existing parties. *See, e.g.*, *Sackman v. Liggett Grp., Inc.*, 167 F.R.D. 6, 20-21 (E.D.N.Y. 1996) (potential of injury to reputation of independent organization satisfies Rule 24(a)(2) criteria for intervention) (citing *Penthouse Int'l, Ltd. v. Playboy Enterprises, Inc.*, 663 F.2d 371, 373 (2d Cir. 1981) (permitting non-party to intervene pursuant to Rule 24 to protect his "professional reputation"); *see also Jane Doe 1 v. United States*, No. 08-CV-80736-KAM, 2015 WL 11254692, at *3 (S.D. Fla. Apr. 7, 2015) (striking scandalous matters pursuant to Rule 12(f) after third party filed motion for limited intervention pursuant to Rule 24). Here, Plaintiffs' allegations concerning nonparty GDGS accuse it and its director of serious crimes of kidnapping, torture and

3

killing at the direction or aid of alleged terrorist organizations that have nothing to do with whether Defendant Iran violated the FSIA as it relates to Plaintiffs. These claims cause GDGS reputational harm considering the allegations in question are demonstrably false and accuse it of serious crimes—although, as explained above and below, the facts supporting said allegations of criminal activity by GDGS do not meet the rigorous definitions of those terms. Furthermore, given the foreign state (Iran) and party (Hezbollah) with which Plaintiffs have falsely associated GDGS, including actions to exact physical violence, GDGS has a genuine concern that the false association of GDGS with said bodies would besmirch GDGS' reputation and undermine the public trust in GDGS during the past decades of the organization's existence—solely based on the purported allegations espoused in the Complaint.

For similar reasons, permissive intervention under the Court's "broad discretion" under Rule 24(b) is also appropriate to provide GDGS a limited appearance to defend its reputational interests. *See Sackman*, 167 F.R.D. at 20-23 ("[T]he Court would be inclined to grant CTR's request for limited intervention under either Fed. R. Civ. P. 24(a)(2), or Rule 24(b), based on this alleged *reputation injury*," notes that "[t]he CTR *also claims a sufficient interest* [to intervene under Rule 24] based on the potential adverse impact that Judge Boyle's decision might have *on its reputation* as an independent body.") 167 F.R.D. at 21 (emphasis added). Accordingly, GDGS claims a sufficient interest based on the adverse impact the allegations in Plaintiffs' complaint have and will have on its reputation. Furthermore, there is no cognizable prejudice to the Plaintiffs or Defendant Iran for GDGS's limited-purpose intervention in this early-stage litigation—which was recently filed, and where the defendant has not yet answered. Finally, as the Court may strike immaterial and scandalous matters on its own initiative, the decision to grant GDGS's request for intervention (while appropriate), is ultimately unnecessary.

B. **The Complaint asserts false, scandalous, impertinent, and highly damaging allegations against GDGS that should be stricken**

Under Fed. R. Civ. P. 12(f), "The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." A matter is "immaterial or impertinent" when it is irrelevant to the resolution of the issue at hand. *See Larouche v. Dep't of the Treasury*, No. 91-1655, 2000 WL 805214, at *15 (D.D.C. Mar. 31, 2000); *Wiggins v. Philip Morris, Inc.*, 853 F. Supp. 457, 457 (D.D.C.1994) ("[I]f allegations in a complaint are irrelevant and prejudicial to the defendant, a motion to strike will be granted"). A pleading is "scandalous" when it "generally refers to any allegation that unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court." 2 Moore's Federal Practice § 12.37[3], at 12-97; *see also In re 2TheMart.com, Inc. Sec. Litig.*, 114 F. Supp. 2d 955, 965 (C.D. Cal. 2000) (A matter is "scandalous where it conveys 'a cruelly derogatory light on a party or other person.'"). Under Rule 12(f), the Court may act either by motion made by a party or **on its own**. *See* Fed. R. Civ. P. 12(f).

Here, as a threshold matter, GDGS is an independent, apolitical Lebanese agency that, (a) is not Hezbollah, nor an agent of the Hezbollah party, and (b) is not Iran, nor an agent of Iran. Thus, Plaintiffs' allegations and bare assertions of such a connection lack any support. As set forth above, of the many scandalous allegations in the Complaint regarding GDGS, the alleged connections between GDGS and Iran or GDGS and Hezbollah are nonexistent.

More importantly, the scandalous allegations against GDGS have no bearing on Plaintiffs' claims against Iran and otherwise contain "impertinent details regarding non-parties" given the alleged conduct by GDGS could not rise to the level of actionable conduct under the FSIA. *See Jane Doe 1*, 2015 WL 11254692, at *3 (striking factual allegations of sexual assault,

5

that proposed third-party intervenor claimed were defamatory and false, as immaterial, impertinent, and unnecessary details unelated the claims in the action).

Plaintiffs claim Mr. Fakhoury was taken hostage, tortured, and "killed" by agents of Defendant Iran, to wit: GDGS and the Lebanese military judiciary. *See* Complaint ¶¶ 48-55, 62, 81-101. As a result, Plaintiffs argue that Iran should be stripped of its sovereign immunity in this instance under the limited exception to the FSIA. Plaintiffs further claim that the alleged conduct by GDGS and others amounts to intentional infliction of emotional distress (IIED), and that Iran should account to Mr. Fakhoury's estate and immediate family members. *Id*. A victim seeking relief under this exception must prove: (1) "the foreign state was designated as a state sponsor of terrorism at the time the act ... occurred," 28 U.S.C. § 1605A(a)(2)(A)(i)(I); (2) "the claimant or the victim was, at the time the act ... occurred a national of the United States," 28 U.S.C. § 1605A(a)(2)(A)(ii)(I); (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration," 28 U.S.C. § 1605A(a)(2)(A)(iii); and (4) an official, employee, or agent of the foreign state, while acting within the scope of his or her office, employment, or agency, (5) engaged in "an act of torture, extrajudicial killing, . . . [or] hostage taking" that caused personal injury or death, 28 U.S.C. § 1605A(a)(1); *see also Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015). "Torture," "hostage-taking," and "extrajudicial killing" are defined terms in the FSIA. *See* 28 U.S.C. § 1605A(h).

First, Mr. Fakhoury was not "kidnapped" by nor a "hostage" of GDGS as those terms are defined in the FSIA, given he was lawfully detained for investigatory purposes and ultimately handed off to another agency responsible for prosecuting the alleged military crimes that he had

been accused of. "Hostage-taking" is defined as the detention of a person with the threat to kill, injure or continue to detain said person, "*in order to compel* a third party, namely, a State, an international intergovernmental organization, a natural or juridical person, or a group of persons, *to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage*." 28 U.S.C. § 1605A(h)(2); *see Radmanesh v. Gov't of Islamic Republic of Iran*, No. 17-CV-1708 (GMH), 2019 WL 1787615, at *7 (D.D.C. Apr. 24, 2019), *aff'd sub nom. Radmanesh v. Islamic Republic of Iran*, 6 F.4th 1338, 1342 (D.C. Cir. 2021) ("This definition 'does not proscribe all detentions,' but only those intended 'to force a third party either to perform an act otherwise unplanned or to abstain from one otherwise contemplated so as to ensure the freedom of the detainee.'") (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 94 (D.C. Cir. 2002)). Plaintiffs allege that Mr. Fakhoury was "abducted" after he returned to collect his passport from GDGS investigators a week after it has been seized, due, in part, to allegations of wrongdoing on Mr. Fakhoury's part for past, military crimes. However, "this theory lacks "[t]he essential element" of a "third-party compulsion." *Radmanesh*, 6 F.4th at 1342 (citing *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 234-35 (D.C. Cir. 2003) ("Simpson alleges that she was held captive and incommunicado for several months, but she does not allege that Libya's intended purpose behind her detention was to compel anyone to do or abstain from doing any act."). Further, Plaintiffs admit GDGS transferred Mr. Fakhoury to another entity over which GDGS has no jurisdiction—vitiating any claim that GDGS's investigation of Mr. Fakhoury, standing alone, is sufficient to maintain a hostage-taking theory of liability regarding Plaintiffs' claims against Defendant Iran.

Moreover, the quid-pro-quo that Plaintiffs hastily allege (*see* Complaint ¶¶ 61-62) makes no logical sense and is belied by public statements from the "quid" at issue: Kassim Tajideen.

7

First, Plaintiffs argue that Mr. Fakhoury was released via diplomatic negotiations and the charges against him (lodged by entities *other than* movant GDGS) were ultimately dropped. Complaint ¶ 61. Then, Plaintiffs claim that Hezbollah denounced and "condemned" Mr. Fakhoury's release. *Id*. Then, in the very next sentence, Plaintiffs speculate that the months-later deportation of convicted criminal Kassim Tajideen from U.S. custody amounted to a "quid," for the "quo" of Mr. Fakhoury's months-prior release. *Id.* ¶ 62. However, how could Hezbollah, the entity that allegedly orchestrated this "hostage taking" and kidnapping, in one breath "condemn" Mr. Fakhoury's release, if his release was supposedly conditioned on the occurrence of another party's release and deportation? It simply cannot. Second, both Tajideen's attorneys[1] and the U.S. State Department have publicly and formally denounced as "false" the claim that Tajideen's deportation had anything to do with Mr. Fakhoury's release. Indeed, the State Department objected to Mr. Tajideen's request for a release for medical reasons during the coronavirus pandemic.[2] Again, how could Plaintiffs' theory that GDGS's initial, limited interrogation of Mr. Fakhoury amounted to a "hostage taking" under the FSIA stand, if both sides (Hezbollah and the

---

[1] De Luce, Dan and Kosnar, Michael, *DOJ Appeals Court's Decision To Release Hezbollah Money Man Early*, NBC News, June 27, 2020, https://www.nbcnews.com/politics/justice-department/doj-appeals-court-s-decision-early-release-hezbollah-money-man-n1232332 (last accessed on November 24, 2021) ("Tajideen's case has prompted speculation in Lebanese media that it is somehow linked to an American, Amer Fakhoury, who was released from prison in Lebanon earlier this year and returned to the United States. Fakhoury was accused of torturing prisoners during the Israeli occupation of Lebanon as a member of the now-defunct Israeli-backed South Lebanon Army. He became a U.S. citizen in 2019. But **one of Tajideen's lawyers, William Taylor, told NBC News that** his client's case was not part of any possible prisoner exchange. '**There [is] absolutely no truth to rumors that U.S. nationals abroad are to be released in connection with Mr. Tajideen's release**,' he said in an email.") (Emphasis added).

[2] MEE Staff, *Convicted Hezbollah financier arrives in Lebanon after early release*, Middle East Eye, July 8, 2020, https://www.middleeasteye.net/news/kassim-tajideen-convicted-hezbollah-financier-returns-lebanon (last accessed on November 24, 2021) ("Kassim Tajideen, 65, was released by US on medical grounds amid concerns over spread of coronavirus . . . 'The fact that he is being released early due to health concerns and removed from the United States does not diminish the severity of his crime,' a Treasury spokesperson previously told MEE. . . .The State Department denied claims that Tajideen's release was linked to that of Fakhoury. '**We have seen some inaccurate reports characterising this judicial action as 'goodwill diplomacy' or part of a 'backroom deal' [related to Fakhoury's release]**,' **a State Department spokesperson said** last month, when Tajideen was being prepared for deportation. '**Those reports are false**.'") (Emphasis added).

United States) objected to Plaintiffs' invented quid and quo? Again, it simply cannot stand—and no "hostage taking" occurred *by GDGS*, such that said allegations are immaterial and impertinent to the resolution of this action.

Next, the admittedly, limited confinement of Mr. Fakhoury and the investigatory tactics allegedly administered by GDGS (while, again, false) are likewise insufficient to amount to "torture" as defined in the FSIA. The "definition of torture includes a 'severity requirement' that is 'crucial to ensuring that the conduct proscribed by the Convention and the TVPA is sufficiently extreme and outrageous to warrant the universal condemnation that the term 'torture' both connotes and invokes.'" *Simpson*, 326 F.3d at 234 (Simpson "alleges . . . that she was 'interrogated and then held incommunicado,' 'threatened with death ... if [she] moved from the quarters [where she was] held,' and 'forcibly separated from her husband ... [and unable] to learn of his welfare or his whereabouts.' Although these alleged acts certainly reflect a bent toward cruelty on the part of their perpetrators, they are not in themselves so unusually cruel or sufficiently extreme and outrageous as to constitute torture within the meaning of the [FSIA]."). "[T]orture does not automatically result whenever individuals in official custody are subjected even to direct physical assault." *Price*, 294 F.3d at 93 (allegations that American citizens were "kicked, clubbed and beaten" by prison guards, and "interrogated and subjected to physical, mental and verbal abuse," during a 105 day prison confinement after arrest, while they "endured deplorable conditions while incarcerated, including urine-soaked mattresses, a cramped cell with substandard plumbing that they were forced to share with seven other inmates, a lack of medical care, and inadequate food" were insufficient to rise to level of "torture"). As the Circuit warned, "not *every* instance of excessive force used against prisoners[ ] is torture under the FSIA." *Id.* (emphasis in original). Rather, torture "is a label that is 'usually reserved for extreme, deliberate

9

and unusually cruel practices,'" such as, "sustained, systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain." *Id*. at 93–94. The allegations as to Mr. Fakhoury's limited detention by GDGS, while categorically false, are significantly less severe than those held to be insufficient in *Price*, *Simpson* and *Radmanesh*. Whether or not Mr. Fakhoury's subsequent treatment when he was no longer in GDGS's custody amount to sufficient allegations are of no moment, given the allegations as to his time with GDGS, standing alone, are insufficient under the FSIA to amount to torture—and thus are quintessentially immaterial and worthy of striking.

Finally, Mr. Fakhoury was not *deliberately killed* by GDGS by any stretch of the imagination nor as that phrase is defined in the FSIA. In other words, even if true, the Plaintiffs' allegations <u>as to GDGS</u> are impertinent because the conduct allegedly attributed to GDGS is insufficient to meet the rigorous jurisdictional and substantive thresholds for either hostage-taking, torture or killing under the FSIA. Thus, the scandalous allegations concerning GDGS would not serve as predicate acts on behalf of defendant Iran for liability under the FSIA, and thus should be stricken.

Indeed, other district courts tasked to determine the merits of claims, have stricken, as immaterial and scandalous, defamatory allegations against third-party, foreign entities with distant association to the parties or claims in the case. *See Estate of Ungar v. Palestinian Auth.*, No. 00 CV-105L, 2003 WL 22012475, at *1 (D.R.I. Aug. 4, 2003) (granting motion to strike pursuant to Rule 12(f) in ATA case and noting "[t]he materials contained in Defendants' Motion for Protective Order and the exhibits thereto constitute a personal attack on counsel in Israel, bear no relevance to this case, are scandalous, scurrilous and irrelevant to this matter."); *see also Estate of Ungar v. Palestinian Auth.*, No. 00-105 L, 2003 WL 21076981, at *1 (D.R.I. Apr. 18,

2003), *aff'd*, No. 00 CV-105L, 2003 WL 22012475 (D.R.I. Aug. 4, 2003) ("The court has reviewed the challenged material and agrees that it is irrelevant and constitutes an effort to malign Plaintiffs by association. The Motion to Strike is, therefore, well founded.").

In other words, even if any or all of Plaintiffs' allegations about GDGS were accurate (which most are not), none of their statements have any bearing on the merits of the case in general. Plaintiffs' attacks on GDGS cannot and do not advance their claims against the Defendant Iran—if for no other reason than because they do not allege any connection between GDGS and Hezbollah, nor any actionable conduct by GDGS regardless of the non-existent affiliation therewith—and are completely irrelevant to the claims and parties in this action. Here, as in *Estate of Ungar*, Plaintiffs' attempt to taint GDGS by association—merely because it is an executive agency in Lebanon, with no association with Defendant Iran, and an even further dissociation with conduct or activities of the designated terrorist organizations referred to in the Complaint—should not be tolerated.

As Plaintiffs' claims do not rise or fall with their (false) allegations concerning GDGS, and considering Plaintiff's claims are both scandalous and impertinent, Plaintiff's claims concerning GDGS should be stricken pursuant to Rule 12(f), either as a result of this motion, or on the Court's own accord.

## CONCLUSION

For the reasons set forth above, Proposed Intervenor GDGS respectfully requests that the Court grant the instant motion in its entirety. In the alternative, should the Court deny GDGS's request to intervene, we respectfully request the Court strike the objectionable provisions *sua sponte*.

Dated: November 29, 2021

11

           _____/s/_____
           David C. Deal
           The Law Office of David C. Deal, P.L.C.
           P.O. Box 1042
           Crozet, VA 22932
           Tel: (434) 233-2727
           Email: david@daviddeal.com


           David D. Lin, Esq.
           (*pro hac vice* forthcoming)
           Justin Mercer, Esq.
           (*pro hac vice* forthcoming)
           Lewis & Lin, LLC
           81 Prospect Street, Suite 8001
           Brooklyn, NY 11201
           Tel: (718) 243-9323
           Email: David@iLawco.com
             Justin@iLawco.com

           *Counsel for the General Directorate of*
           *General Security of Lebanon*