IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------------------------------------------------X

ESTATE OF AMER FAKHOURY, *et al.*,

                            Plaintiffs,

            -against-

ISLAMIC REPUBLIC OF IRAN, *et al*,

                           Defendants.

Docket No:
21-cv-1218 (JDB)

---------------------------------------------------------------------X

### PLAINTIFFS' OPPOSITION TO MOTION OF NON-PARTY REPUBLIC OF LEBANON GENERAL DIRECTORATE OF GENERAL SECURITY TO INTERVENE AND STRIKE PLEADINGS

This is an action against the Islamic Republic of Iran ("Iran") under the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A ("FSIA"). Plaintiffs claim that their decedent, United States citizen Amer Fakhoury, was wrongfully imprisoned, held hostage, tortured, and otherwise damaged in Lebanon by the Hezbollah terrorist organization that dominates the Lebanese government, and that this was done with the sponsorship of Iran, which is well known to be sponsoring and pulling the strings of Hezbollah. The complaint named Iran as the only defendant.

Now before the Court is a very strange and unusual motion filed by a non-party, the Republic of Lebanon General Directorate of General Security ("Lebanon GDGS"). The Lebanon GDGS, asserting that it is a branch of the Lebanese government, appeared in this action and filed a motion to intervene and upon intervention to strike allegations from the complaint about the actions of the Lebanon GDGS, on the ground that the Lebanon GDGS claims the allegations of the complaint cast the Lebanon GDGS in a bad light. (Dkt. 7). No affidavit from any person with

knowledge is submitted. Essentially, this hitherto non-party Lebanon GDGS is seeking to strike core allegations of Plaintiff's case—thereby doing the bidding of Defendant Iran, Hezbollah's customary role—and doing so based on nothing but some unsupported *ipse dixit* remarks of its lawyer.

### A.    Intervention is Unopposed

Plaintiff does not oppose the intervention of Lebanon GDGS as a party.

The actions of the Lebanese government are obviously at issue in this case. Iran's terrorist activities are frequently conducted through proxies, such as the Lebanese terrorist organization Hezbollah. *See Stern v. Islamic Republic of Iran,* 271 F. Supp. 2d 286, 292 (D.D.C. 2003) (finding Hezbollah is an Iranian proxy). Hezbollah dominates the Lebanese government (Dkt. # 1, ¶ 36), including the Lebanon GDGS. It is well known that the head of Lebanon GDGS, Abbas Ibrahim, "like his predecessors is closely associated with Hezbollah." https://yalibnan.com/2011/07/18/cabinet-appoints-abbas-ibrahim-as-lebanon-security-chief/ (last visited Dec. 28, 2021).

Plaintiff is seeking to hold Iran liable for the actions of its proxies in Lebanon. Plaintiff certainly welcomes the Republic of Lebanon ("Lebanon") as a party to this case. Indeed, the prospect of having an active party, represented by counsel, and participating in this litigation, including documentary discovery, depositions, and trial, is a breath of fresh air as compared to the numerous cases of this nature which are decided on default based on expert testimony but no live witnesses to be cross-examined.

Plaintiff did not name Lebanon or its constituent component Lebanon GDGS as a defendant because the state-sponsored terrorism exception to sovereign immunity provided by 28 U.S.C. § 1605A requires that the defendant state have a special designation as defined in § 1605A(h)(6) ("a country the government of which the Secretary of State has determined, for purposes of section

6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), section 620A of the Foreign Assistance Act of 1961 ( 22 U.S.C. 2371 ), section 40 of the Arms Export Control Act (22 U.S.C. 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism.") At present, only Cuba, Iran, North Korea, and Syria have this designation.

However, Lebanon's voluntary appearance in this action, its request to intervene, and its application for affirmative relief adjudicating merits issues in this case constitute a waiver of sovereign immunity, and therefore there is jurisdiction over Lebanon pursuant to 28 U.S.C. § 1605(a)(1) ("A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—(1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver.")

By intervening, Lebanon "subjected themselves to the personal jurisdiction of this Court." *In re Chevron Corp.,* 736 F. Supp. 2d 773, 786-87 (S.D.N.Y. 2010).

> [A] party that intervenes also submits to the personal jurisdiction of the court and cannot move to dismiss for lack of personal jurisdiction. *Id.; County Sec. Agency v. Ohio Dep't of Commerce,* 296 F.3d 477, 483 (6th Cir. 2002) ("[A] motion to intervene is fundamentally incompatible with an objection to personal jurisdiction."); (finding that voluntary intervention resulted in personal jurisdiction over intervening party); *Pharmaceutical Research & Mfrs. of Am. v. Thompson,* 259 F. Supp. 2d 39, 39 (D.D.C. 2003) (refusing to allow an intervenor-defendant to defeat a motion to amend complaint by arguing futility due to lack of personal jurisdiction); *City of Santa Clara v. Kleppe,* 428 F. Supp. 315, 317 (N.D. Cal. 1976) (holding that voluntary intervention submits a party to a court's personal jurisdiction).

*Inversora v. Energoprojekt Holding Co.,* No. 03-73 (RWR), 2007 U.S. Dist. LEXIS 104202, at *4 (D.D.C. Feb. 22, 2007).

> ***When a party intervenes, it becomes a full participant in the lawsuit and is treated just as if it were an original party***. *See District of Columbia v. Merit Systems Protection Board,* 246 U.S. App. D.C. 35, 762 F.2d 129, slip op. at 5 (D.C. Cir. 1985); *Marcaida v. Rascoe,* 569 F.2d 828, 831 (5th Cir. 1978). The intervenor renders itself "vulnerable to complete adjudication by the federal court of the issues in litigation between the intervenor and the adverse party." *United States v. Oregon,* 657 F.2d 1009, 1014 (8th Cir. 1981) (quoting 3B Moore's Federal Practice para. 24.16[6] (2d ed. 1981)). It is said to assume the risk that its position will not prevail and that an order adverse to its interests will be entered. See 7A C. Wright & A. Miller, Federal Practice & Procedure § 1920, at 611 (1972). As we said recently, "the possibility that the plaintiff will be able to obtain relief against the intervenor-defendant" is part of the "price" paid for intervention. *District of Columbia,* 246 U.S. App. D.C. 35, 762 F.2d 129, slip op. at 6.

*Schneider v. Dumbarton Developers, Inc.,* 767 F.2d 1007, 1017 (1985) (emphasis added).

The nature of Lebanon's intervention in this case cannot be described as "limited purpose" as movants do in their motion papers. This is not, for example, an application to seek access to sealed documents, or a television station moving for permission to televise a court proceeding. Rather, in this motion Lebanon seeks an adjudication on the merits in the form of striking of pleadings, which is a very robust general intervention.

In light of its voluntary appearance and waiver of sovereign immunity, Plaintiffs shall proceed to treat Lebanon "as if it were an original party," *District of Columbia v. Merit Sys. Prot. Bd.,* 762 F.2d 129, 132 (D.C. Cir. 1985), and shall be filing, simultaneously with this opposition, a motion to file a supplemental complaint asserting claims against Lebanon (leaving the claims against Iran unchanged).

### B.     There is No Basis to Strike Anything from the Complaint

Movant Lebanon GDGS' motion seeks to strike factual allegations from Plaintiff's complaint against Iran based on nothing but pot-shot arguments from the sidelines, claiming little more than that the allegations are embarrassing to Lebanon GDGS, or that in the opinion of

-4-

Lebanon GDGS the allegations are not necessary to Plaintiffs' claim against Iran. The motion seems to ignore the motion to dismiss standard of Fed. R. Civ. P. 12(b), which requires the allegations of the pleading to be accepted as true, *Valambhia v. United Republic of Tanzania,* 964 F.3d 1135, 1137 (D.C. Cir. 2020) ("we accept the amended complaint's factual allegations as true and construe all reasonable inferences in the plaintiffs' favor"), and it ignores the Fed. R. Civ. P. 56 summary judgment standard, which requires a showing that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). Instead, under the guise of a motion pursuant to Fed. R. Civ. P. 12(f) to strike "immaterial, impertinent, or scandalous matter," the motion presents a misleading flyspecking of the complaint against Iran, transparently a proxy maneuver by a government agency dominated by Hezbollah to benefit Hezbollah's sponsor, Iran, and offers nothing but the opinion of Lebanon's counsel as to what is a valid or necessary allegation.

> Fed. R. Civ. P. 12(f) is very narrow. As Judge Chutkan recently explained:
>
> Federal Rule 12(f) provides that "upon motion made by a party within 20 days of service of the pleading upon the party…the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Statements are to be stricken as 'scandalous' only when they contain allegations 'that unnecessarily reflect[] on the moral character of an individual[.]'" *Cobell v. Norton,* 224 F.R.D. 1, 5 (D.D.C. 2004) (quoting 2 Moore's Federal Practice § 12.37[3] at 12-97); *see also In re TheMart.com, Inc., Securities Litig.,* 114 F. Supp. 2d 955, 965 (C.D. Cal. 2000) ("scandalous" includes allegations that cast "a cruelly derogatory light on a party or other person"). To qualify as "scandalous," the allegation in question must at least be found lacking in evidentiary support. *See, e.g., Pigford v. Veneman,* 215 F.R.D. 2, 4-5 (D.D.C. 2003). Whether to grant a motion to strike is "firmly within the discretion of the district court," and such a motion should be granted only where "it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation," *Cobell v. Norton,* 224 F.R.D. 266, 282 (D.D.C.

2004) (quoting *Ulla-Maija, Inc. v. Kivimaki*, No. 02 Civ. 3640, 2003 WL 169777, at *4 (S.D.N.Y. 2003)), or "unless it can be shown that no evidence in support of the allegations would be admissible[,]" *id.* (quoting *Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 893 (2d Cir. 1976)).

*Allen v. Addi,* Civil Action No. 20-cv-01650 (TSC), 2021 U.S. Dist. LEXIS 244655, at *10-11 (D.D.C. Nov. 23, 2021). And Judge Lamberth recently held:

> But motions to strike are particularly "disfavored" by the federal courts. *Wiggins v. Philip Morris, Inc.,* 853 F. Supp. 457, 457 (D.D.C. 1994). Only if the allegations in a complaint are both irrelevant and prejudicial to defendant will a motion to strike be granted. *Id.*

*Campaign Legal Ctr. v. Iowa Values,* No. 21-cv-389-RCL, 2021 U.S. Dist. LEXIS 224084, at *7 (D.D.C. Nov. 19, 2021); *see also Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd.,* 647 F.2d 200, 201 (D.C. Cir. 1981) ("motions to strike, as a general rule, are disfavored.")

> Granting a motion to strike is a "'drastic remed[y] that courts disfavor,'" but trial judges have discretion to either grant or deny such motion. *Riddick v. Holland,* 134 F. Supp. 3d 281, 285 (D.D.C. 2015) (quoting *United States ex rel. Landis v. Tailwind Sports Corp.,* 308 F.R.D. 1, 4 (D.D.C. 2015)). Rule 12(f) itself does not require the striking of prejudicial matters, and although courts disfavor motions to strike, courts have granted such motions upon a showing that parts of a pleading "are prejudicial or scandalous." *Nwachukwu v. Rooney,* 362 F. Supp. 2d 183, 190 (D.D.C. 2005). Therefore, "absent a 'strong reason for so doing,' courts will generally 'not tamper with pleadings.'" *Nwachukwu v. Rooney,* 362 F. Supp. 2d 183, 190 (D.D.C. 2005) (quoting *Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 893 (2d Cir. 1976)).

*United States v. Three Sums Totaling $612,168.23 in Seized United States Currency,* Civil Action No. 19-130 (RBW), 2021 U.S. Dist. LEXIS 103994, at *10-11 (D.D.C. June 3, 2021).

The allegations of Plaintiff's complaint which Lebanon GDGS seeks to strike do not remotely meet any of these standards. Far from having "no possible bearing on the subject matter of the litigation," the standard laid down in *Allen* and the *Cobell* and *Ulla-Maija* cases it cites, the allegations which Lebanon GDGS seeks to strike are central to Plaintiff's claim. The core

allegations of Plaintiff's claim are that he was tricked into coming to Lebanon (Dkt. # 1, ¶¶ 43-45), then when in Lebanon had his United States passport confiscated (Dkt. #1, ¶¶ 46), was the subject of a front-page article in a Hezbollah-controlled newspaper falsely accusing him of crimes decades earlier (Dkt. # 1, ¶ 47), then was tricked into coming to the Lebanon GDGS office to retrieve his passport (Dkt. # 1, ¶¶ 48), once there was detained and tortured by the Lebanon GDGS (Dkt. # 1, ¶¶ 49-62), and all of this was with the sponsorship of Defendant Iran, through its sponsorship of Hezbollah (Dkt. # 1, ¶¶ 36, 65-80). Those are mostly the allegations that Lebanon GDGS seeks to strike. Without these allegations, little would be left of Plaintiff's case.

Movant Lebanon GDGS seeks to portray itself as basically a passport office. But its own website reveals that it has much more sinister roles too, including:

- Participating in Judicial investigations within the limits of threats against internal and/or external state security
- Supervising the preparation and implementation of security measures
- Fight against anything that can jeopardize security: by closely investigating all sabotage acts and chasing after anarchy militants, and rumor spreaders, that attempt to endanger national security
- Fighting dissolved parties, but also secret prohibited associations
- Preparing notices and pursuits related to investigations, to entry ban, or to travel ban

https://www.general-security.gov.lb/en/posts/3 (last visited Dec. 28, 2021). Plainly these functions more closely resemble the rule of secret police in an authoritarian regime than Lebanon GDGS would let on. Factual development is needed before this issue can be adjudicated.

Movant Lebanon GDGS tries to make a technical argument that the detention of Plaintiffs' decedent was not "hostage taking" within the meaning of 28 U.S.C. § 1605A(a)(1) because while Plaintiff's decedent may have been detained, it was not for a *quid pro quo*, *i.e.* not to cause someone else to do something, like pay a ransom. But that argument is spurious, since the

complaint clearly alleges that Plaintiff's decedent was kidnapped and held hostage as part of a scheme to secure the release of Kassim Tajideen, a Lebanese national who was imprisoned in the United States for his role in financing Hezbollah terrorist activities around the world (Dkt. # 1, ¶ 62).

It is all well and good that Movant Lebanon GDGS' counsel quotes some sources on the internet denying that Tajideen's release from US prison was part of a prisoner exchange *quid pro quo* with Plaintiff's decedent, but those web links are hardly the end of the matter, as this sort of thing is typically done quietly and behind the scenes, and with plausible deniability in the official record. Factual development is certainly necessary to connect the dots, but the dots are there to be seen. A 2019 Department of Justice press release about Tajideen stated:

> The operator of a network of businesses in Lebanon and Africa whom the U.S. Department of the Treasury designated as a financier of Hezbollah, the Lebanon-based terrorist group, was sentenced to five years in prison and ordered to forfeit $50 million by U.S. District Judge Reggie B. Walton of the District of Columbia.
>
> Kassim Tajideen, 63, had previously pleaded guilty to one count of conspiracy to launder monetary instruments in furtherance of violating the International Emergency Economic Powers Act (IEEPA). In 2009, the U.S. Department of the Treasury designated Tajideen as a Specially Designated Global Terrorist based on his tens of millions of dollars of financial support of Hezbollah.

https://www.justice.gov/opa/pr/lebanese-businessman-tied-treasury-department-hezbollah-sentenced-prison-money-laundering (last visited Dec. 28, 2021). Then the detention of Plaintiffs' decedent by Lebanon was raised by Senator Jeanne Shaheen at the confirmation hearing of the United States Ambassador to Lebanon, https://www.shaheen.senate.gov/news/multimedia/watch/at-sfrc-hearing-shaheen-seeks-assurances-from-nominee-to-be-ambassador-to-lebanon-on-amer-fakhoury (last visited Dec. 28. 2021), then in July 2020 Tajideen was released on grounds of compassionate release and sent back to Lebanon, https://www.ice.gov/news/releases/ice-removes-hezbollah-financier-lebanon (last visited Dec. 28, 2021). Moreover, even if Tajideen's release,

nominally for medical reasons relating to COVID-19, was coincidental, that does not mean that the detention of Plaintiffs' decedent was not perpetrated in the first place for the purpose of securing Tajideen's release.

Movant Lebanon GDGS next contends that the torture of Plaintiffs' decedent alleged in the complaint was insufficient to serve as the basis for a claim because it was not severe enough. Yet the complaint alleges that Plaintiff's decedent, Amer Fakhoury, was made to watch other prisoners being savagely beaten, was beaten himself by as many as ten men while he had a black sack placed over his head, threatened him with being released to an angry mob to be torn apart, threatened with being sent to Iran to be imprisoned (and likely disappeared) there, deprived of medical treatment, nourishment, water, and held in solitary confinement. Most seriously, he was deprived of treatment for the stage four lymphoma that he suffered from, and for Epstein-Barr virous. (Dkt. # 1, ¶¶ 49-56). The notion that this sort of treatment does not at least arguably constitute torture actionable under § 1605A is without basis, and is inconsistent with numerous previous decisions arising under § 1605A. *See Anderson v. Islamic Republic of Iran,* 90 F. Supp. 2d 107 (D.D.C. 2000) (holding Iran liable where plaintiff held captive and tortured by Hezbollah); *Sutherland v. Islamic Republic of Iran,* 151 F. Supp. 2d 27 (D.D.C. 2001) (same); *Cicippio v. Islamic Republic of Iran,* 18 F. Supp. 2d 62 (D.D.C. 1998) (same); *Kilburn v. Islamic Republic of Iran,* 699 F. Supp. 2d 136 (D.D.C. 2010) (same); *Wyatt v. Syrian Arab Republic,* 908 F. Supp. 2d 216 (D.D.C. 2012) (holding Syria liable where terrorist group sponsored by Syria held US citizens captive for 21 days, deprived them of sleep and nutrition, and put them through forced marches and fake executions); *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120 (D.D.C.2005) (awarding damages to victims of long-term kidnapping and torture); *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260 (D.D.C. 2002) (same); *Hill v. Republic of Iraq,* 175

F. Supp. 2d 36 (D.D.C. 2001), rev'd on other grounds, 328 F.3d 680 (D.C .Cir. 2003) (awarding damages to Americans interned by Iraq prior to Desert Storm); *Cronin v. Islamic Republic of Iran,* 238 F. Supp. 2d 222 (D.D.C. 2002) (awarding damages for hostage held four days); *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78 (D.D.C. 2002) (awarding damages to hostages held sixteen days).

Last, Movant Lebanon GDGS asserts that Plaintiffs' complaint does not allege any connection between Lebanon GDGS and Hezbollah or Iran, and goes so far as to say that the relationship is "nonexistent" (Dkt. 7, p. 14)—based on nothing but the unsupported say-so of Lebanon GDGS' counsel in a memorandum of law. Building on this contention, Lebanon GDGS asserts that the allegations regarding Lebanon GDGS are not relevant to the claim against Iran.

Lebanon GDGS' contention regarding the lack of such allegations in the complaint is easily dispatched. The complaint alleges:

> In the years that followed the Israeli withdrawal, Hezbollah's influence and control within Lebanon increased. Hezbollah asserted an ever-expanding political stake in Lebanon's domestic and foreign affairs; the terrorist group's leadership established its alternative government that rivaled the official Lebanese one. Hezbollah's military capabilities exceeded the strength and capabilities of the Lebanese Armed Forces ("LAF") making it the most powerful military force in the country. As a result of numerous tragic incidents, though, along with Hezbollah's tactics of perpetrating violence and intimidation against Lebanese officials and civilians, the Shiite Party of God lost favor with most Lebanese citizens. It has repeatedly been accused by its opponents of corruption and the appropriation of governmental funds. It is widely viewed as a terrorist group controlled by its masters in Iran whose policies and goals are dictated by the interests of Tehran. The LAF and the Lebanese population are in fear and intimidation of the Shiite group's strength, weapon stockpiles, and brutality. Hezbollah representatives were elected to the Lebanese parliament and serve as ministers and senior officials. All major political decisions in Lebanon, including the appointment of its president and prime minister, require Hezbollah's agreement and approval. Today, Hezbollah, under Iran's control, is understood to be the de-facto dominant authority in Lebanon whose policies and goals usurp those advanced by its democratically elected officials. It decides crucial matters of foreign policy and must approve senior political appointments. Hezbollah asserts a powerful and malicious influence over

>the country's economy, banking institutions, and financial system. Many blame Hezbollah for the country's current economic collapse and paralysis; Hezbollah has been accused of being responsible for the catastrophic blast that destroyed large swathes of Beirut in the summer of 2020 and other threats to public safety. The Lebanon of today cannot be considered an independent nation and most citizens hope that Hezbollah's control will be terminated.

(Dkt. # 1, ¶ 36). It further alleges that the men who questioned Plaintiffs' decedent while he was being detained by Lebanon GDGS and tortured appeared to be members of Hezbollah. (Dkt. # 1, ¶ 50); and that Plaintiffs' decedent was abducted, tortured, and abused "at the hands of Hezbollah." (Dkt. # 1, ¶ 64). It alleges at great length that Hezbollah is a proxy arm of Iran. (Dkt. # 1, ¶¶ 65-80). That Hezbollah is an Iranian proxy has previously been determined by courts in this district: "Hezbollah is an Iranian proxy organization, controlled, funded and operated by Iran…Iran's control over Hezbollah is so far-reaching that [the federal courts have] repeatedly held Iran vicariously liable, under the doctrine of respondeat superior, for actions of Hezbollah." *Stern,* 271 F. Supp. 2d at 292.

None of the allegations of the complaint regarding Lebanon GDGS is superfluous or unnecessary. They are all part of telling the story of Plaintiffs' claim, and they are integral to the claim to the extent that the complaint would not make sense without them. All the specified allegations have bearing on Plaintiffs' claim, and would be admissible at trial. In short, there is no basis whatsoever to strike them.

**WHEREFORE**, the motion of intervenor Lebanon GDGS should be granted and Lebanon should be made a party to this action for all purposes, and the motion of Lebanon GDGS to strike material from the complaint against Iran should be denied in all respects.

Dated:   Brooklyn, New York
         December 28, 2021

                                           Respectfully submitted,

                                           THE BERKMAN LAW OFFICE, LLC
                                           *Attorneys for Plaintiffs*

                                         by: _____
                                                Robert J. Tolchin

                                         111 Livingston Street, Suite 1928
                                         Brooklyn, New York 11201
                                         718-855-3627

**CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that on the date indicated below a true copy of the foregoing was served via ECF on all counsel of record herein:

Dated:    Brooklyn, New York
            December 28, 2021

                                            Robert J. Tolchin