## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ESTATE OF AMER FAKHOURY, et al.,**<br><br>    **Plaintiffs,**<br><br>       v.<br><br>**THE ISLAMIC REPUBLIC OF IRAN,**<br><br>    **Defendant.** | **Civil Action No. 21-1218 (JDB)** |

## <u>MEMORANDUM OPINION</u>

Plaintiffs brought this action against defendant the Islamic Republic of Iran to recover damages stemming from the alleged kidnapping, torture, and killing of Amer Fakhoury.  Compl. [ECF No. 1] ¶¶ 82–108.   Portions of plaintiffs' complaint discuss Fakhoury's detention in Lebanon; the torture he allegedly suffered at the hands of Hezbollah; and his release, which plaintiffs claim resulted in the quid-pro-quo release of a Lebanese national held by the U.S. Bureau of Prisons.  E.g., id. ¶¶ 48–55, 62.

The General Directorate of General Security of Lebanon ("GDGS") filed a motion to intervene "for the limited purpose of moving to strike the allegations made against it in the complaint . . . pursuant to" Federal Rule of Civil Procedure 12(f).  Proposed Intervenor GDGS's Mot. for Limited Intervention & to Strike [ECF No. 7] ("Mot. to Strike Compl.") at 1.  In addition to opposing GDGS's motion, Pls.' Opp'n to Mot. to Strike Compl. [ECF No. 9] ("Opp'n to Mot. to Strike Compl."), plaintiffs moved for leave to file a supplemental complaint against the Republic of Lebanon and GDGS, arguing that, by intervening, Lebanon "consented to the jurisdiction of this Court," Mot. by Pls. for Leave to File a Suppl. Compl. Against the Republic of Lebanon & GDGS [ECF No. 10] ("Mot. to File Suppl. Compl.") at 2.  Finally, after briefing on these two motions ended, GDGS filed a supplemental memorandum in further support of its motion to strike,

GDGS's Suppl. Mem. of L. in Further Supp. of Mot. to Strike Compl. [ECF No. 16] ("Suppl. Mem. in Supp. of Mot. to Strike Compl."), which plaintiffs then moved to strike as an unauthorized sur-reply, Mot. by Pls. to Strike Unauthorized Sur-Reply Filed by Intervenor GDGS [ECF No. 17] ("Mot. to Strike Sur-Reply").  For the reasons explained below, the Court will grant only plaintiffs' motion to strike GDGS's sur-reply and will deny all other requests.

## Background[1]

### I.    Factual Background

Amer Fakhoury was a member of the South Lebanese Army from 1983 to 2000.  Compl. ¶ 27.  The South Lebanese Army was a Christian faction within the Lebanese Army that opposed Hezbollah and the Palestine Liberation Organization in Lebanon.  Id. ¶ 22.  While in the South Lebanese Army, Fakhoury worked at the Khiam Detention Center for eight years.  Id. ¶ 28. Plaintiffs claim that his position was "purely logistical" and that he was responsible for tasks such as "supplying food and essentials to . . . the soldiers and prisoners stationed there."  Id.

The South Lebanese Army aligned with and was supported by Israel, Compl. ¶ 23, but when Israel withdrew from South Lebanon in 2000, members of the South Lebanese Army were left vulnerable to attacks from Hezbollah, id. ¶ 30.  Fakhoury fled to Northern Israel that same year.  Id. ¶ 37.  Fakhoury and his family then immigrated to the United States in 2001 and have lived in the New England area ever since.  Id. ¶¶ 40–41.

Plaintiffs allege that since Israel's withdrawal, Hezbollah has become the controlling force in Lebanon.  Compl. ¶ 36 (describing Hezbollah as "the de-facto dominant authority in Lebanon"). According to plaintiffs' complaint, "[a]ll major political decisions in Lebanon, including the

---

[1] The relevant facts are drawn mostly from plaintiffs' complaint and presumed to be true for present purposes. As will be discussed later, however, GDGS argues that many of plaintiffs' allegations "are demonstrably false and serve no purpose but to tarnish the stellar reputations of GDGS and [head of GDGS, Major General Abbas Ibrahim.]" Mot. to Strike Compl. at 2.

appointment of its president and prime minister, require Hezbollah's agreement and approval." Id. Plaintiffs claim that Hezbollah was able to achieve this level of dominance with substantial help from Iran. Id. ¶¶ 11, 29, 33, 77–80. Plaintiffs further claim that Hezbollah is under Iran's control and that Iran utilizes Hezbollah as an instrument to achieve its goals. Id. ¶¶ 34, 36.

In 2011, the Parliament of Lebanon passed an amnesty act allowing former Lebanese citizens who had served in the South Lebanese Army to return without fear of prosecution. Compl. ¶ 42. After becoming a naturalized U.S. citizen in 2019, Fakhoury began exploring the possibility of returning to Lebanon for a visit. Id. ¶ 43. He received assurances from the U.S. Department of State and the Lebanese government that he could visit Lebanon safely. Id. ¶ 44. He arrived in Beirut on September 4, 2019 with his wife and two of his daughters. Id. ¶ 45.

But when Fakhoury reached passport control at Beirut International Airport, a security official informed him that the official needed to hold onto his U.S. passport for a security check and that Fakhoury could retrieve the document a week later. Comp. ¶ 46. On September 11, 2019, al-Akhbar, a Hezbollah controlled newspaper, published a front-page story accusing Fakhoury of playing a role in the torture of inmates at the Khiam detention center, labeling him the "Butcher of Khiam," and demanding his prosecution. Id. ¶ 47 (denying these accusations). After this article's publication, there were violent Hezbollah demonstrations throughout Beirut, including outside various government agencies. Id.

Fakhoury travelled to the Beirut offices of GDGS on September 12, 2019 to retrieve his passport. Compl. ¶ 48. He was arrested, id., and "subjected to psychological and physical torture," id. ¶ 49. Fakhoury claims that he was forced to watch as security personnel beat prisoners (some as young as 14), was beaten himself several times (by "as many as ten men" on one occasion), was threatened with execution unless he signed a declaration of guilt, and was threatened with being

held hostage in Iran.  Id. ¶¶ 49–53; see also id. ¶ 56 ("The beatings he endured resulted in fractured ribs; Amer Fakhoury complained of crippling abdominal pains throughout his incarceration, . . . [but] he never received medical attention of any kind.").  Fakhoury was held in a military prison for three months before being moved to a military hospital.  Id. ¶¶ 56, 58.  A doctor diagnosed him with stage four lymphoma, and "[h]is condition was accelerated by Epstein-Barr Virus that [Fakhoury] contracted as a result of the relentless beatings and unsanitary conditions he was subjected to during his captivity."  Id. ¶ 58.

In March 2020, Fakhoury was transferred from the military hospital to the U.S. Embassy in Beirut.  Compl. ¶ 60.  The Lebanese Supreme Court then announced that it was dismissing the charges against him.  Id. ¶ 61.  Fakhoury returned to the United States on March 19.  See id. ¶ 60.  In June 2020, the United States released Kassim Tajideen, a Lebanese national held by the U.S. Bureau of Prisons for his role in financing Hezbollah terror operations.  Compl. ¶ 62.  Plaintiffs allege that this release completed the quid-pro-quo exchange that secured Fakhoury's freedom.  Id. ¶¶ 59, 62.

"Fakhoury returned to the United States a broken man."  Compl. ¶ 63.  He suffered from Post-Traumatic Stress Disorder, and his cancer was exacerbated by an autoimmune disease.  Id.  He died in August 2020.  Id. ¶ 64.

## II.   Procedural History

Plaintiffs filed suit against Iran in May 2021.  See Compl. at 28.  In November 2021, GDGS moved to intervene for the sole purpose of striking allegations in plaintiffs' complaint.  Mot. to Strike Compl. at 1, 11.  GDGS asks the Court to strike the allegations at paragraphs 48 through 55 and paragraph 62.  Id.  These paragraphs discuss Fakhoury's detention in Lebanon and plaintiffs' claim that the U.S. released Tajideen to complete a quid-pro-quo exchange for Fakhoury.

Compl. ¶¶ 48–55, 62.  GDGS claims that these allegations should be struck because they are "categorically false," "have nothing to do with whether Iran violated" the Foreign Sovereign Immunities Act ("FSIA"), and are insufficient to demonstrate that GDGS violated the FSIA.  Mot. to Strike Compl. at 2, 5–11.

Plaintiffs filed their opposition to GDGS's motion in December 2021.  Opp'n to Mot. to Strike Compl. at 12.  While plaintiffs argued that there was no basis to strike any allegations in the complaint, Opp'n to Mot. to Strike Compl. at 4–11, they "welcome[d]" GDGS and Lebanon to the case and did not oppose GDGS's motion to intervene, id. at 2.  Indeed, plaintiffs moved for leave to file a supplemental complaint against Lebanon and GDGS on the same day.  Mot. to File Suppl. Compl. at 3.

GDGS filed its reply in further support of its motion to strike on January 26, 2022.  GDGS's Reply Mem. of L. in Further Supp. of Mot. to Strike Compl. [ECF No. 14] ("Reply in Supp. of Mot. to Strike Compl.") at 11.  In its reply, GDGS argued that the Court need not decide whether GDGS should be permitted to intervene because the "Court may strike immaterial and unrelated allegations in a complaint on its own accord under Rule 12(f)."  Id. at 2.  GDGS also reiterated its argument that the complaint's allegations about Fakhoury's detention in Lebanon are irrelevant to plaintiffs' claims against Iran.  Id. at 8–11.

Nearly two weeks later, on February 8, 2022, GDGS filed a supplemental memorandum in further support of its motion to strike plaintiffs' complaint.  Suppl. Mem. in Supp. of Mot. to Strike Compl. at 6.  This supplemental memorandum notifies the Court that on February 3, 2022, Guila Fakhoury—a plaintiff in this case and one of Amer Fakhoury's daughters—posted a tweet claiming that GDGS kidnapped, tortured, and killed Fakhoury under direct orders from Hezbollah and Iran.  Id. at 2.  The supplemental memorandum also contains several exhibits with information

relevant to Fakhoury's detention and prosecution as well as a declaration from the Head of the Intelligence Office at GDGS generally denying plaintiffs' narrative.  <u>See</u> Decl. of Brigadier General Youssef Medawar of GDGS [ECF No. 16-1] ¶¶ 4, 6 (describing Fakhoury as "a Lebanese expatriate and convicted felon who has been the subject of legal, judicial, and security prosecutions in Lebanon" and denying plaintiffs' allegations).  Plaintiffs responded to GDGS's supplemental memorandum and attached exhibits with their own motion to strike.  Mot. to Strike Sur-Reply at 1.  GDGS did not file any opposition to plaintiffs' motion.

<u>Analysis</u>

There are three motions now before the Court: GDGS's motion to intervene and to strike portions of plaintiffs' complaint, plaintiffs' motion for leave to file a supplemental complaint against Lebanon and GDGS, and plaintiffs' motion to strike GDGS's supplemental memorandum and exhibits as an unauthorized sur-reply.  The Court will address these three motions in reverse order.  For the reasons that follow, the Court will grant plaintiffs' motion to strike but deny both plaintiffs' motion to file a supplemental complaint and GDGS's motion to intervene and to strike.

**I.   Plaintiffs' Motion to Strike**

Rule 7 of the Local Rules for the U.S. District Court for the District of Columbia does not entitle parties to file sur-replies, <u>Akers v. Liberty Mut. Grp.</u>, 744 F. Supp. 2d 92, 94 n.1 (D.D.C. 2010); <u>see</u> L. Civ. Rule 7(a), (b), (d) (referring to motions, oppositions, and replies), and parties generally may not file sur-replies without first obtaining a court's permission, <u>see</u> <u>Robinson v. Ergo Sols., LLC</u>, 10 F. Supp. 3d 157, 163 n.1 (D.D.C. 2014) ("[I]t is standard practice for a party seeking to file a surreply to move the court for leave to file such a surreply." (citation omitted)); <u>Williams v. Ct. Servs. & Offender Supervision Agency</u>, Civ. A. No. 08-cv-1538 (RCL-AK), 2014 WL 12788954, at *5 (D.D.C. Mar. 6, 2014).  "[S]urreplies are generally disfavored . . . , and the

determination of whether to grant or deny leave [to file one] is entrusted to the sound discretion of the district court." Crummey v. Soc. Sec. Admin., 794 F. Supp. 2d 46, 62 (D.D.C. 2011) (internal citation omitted).

There are several reasons why plaintiffs' motion to strike GDGS's supplemental memorandum should be granted. As an initial matter, GDGS never filed an opposition to plaintiffs' motion, which the Court takes as a concession of the motion's validity. See L. Civ. Rule 7(b) ("If [a memorandum in opposition] is not filed within [14 days of service of a motion,] the Court may treat the motion as conceded."); Alvarado v. Rainbow Inn, Inc., 312 F.R.D. 23, 31 (D.D.C. 2015) ("[T]he Court will treat the motion as conceded because [defendant] failed to file a timely response."). GDGS similarly failed to obtain the Court's permission before filing its sur-reply in violation of the Local Rules and standard practice. See Robinson, 10 F. Supp. 3d at 163 n.1; Akers, 744 F. Supp. 2d at 94 n.1.

In addition to these technical defects, GDGS's supplemental memorandum is also improper because GDGS filed the memorandum after already filing both its motion and a reply. See generally Mot. to Strike Compl.; Reply in Supp. of Mot. to Strike Compl. "A surreply may be filed . . . only to address new matters raised in a reply, to which a party would otherwise be unable to respond." U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc., 238 F. Supp. 2d 270, 276 (D.D.C. 2002). "That is to say, the point of a surreply is to allow a party to respond to an opponent's new facts and arguments—not to unearth facts and arguments never before raised." González–Vera v. Townley, 83 F. Supp. 3d 306, 315 (D.D.C. 2015). GDGS's supplemental memorandum contains several new exhibits and a new declaration in support of its original motion. Permitting GDGS to file these documents after already having the opportunity to file a

memorandum in support of its motion and a reply would be patently unfair to plaintiffs.[2]   The Court accordingly will grant plaintiffs' motion to strike GDGS's supplemental memorandum and its associated exhibits.

## II.   Plaintiffs' Motion for Leave to File a Supplemental Complaint

Pursuant to Federal Rule of Civil Procedure 15(d), a court "may, on just terms, permit a party to serve a supplemental pleading."   "The decision whether to grant leave to amend or supplement a complaint is within the discretion of the district court, but leave 'should be freely given unless there is a good reason, such as futility, to the contrary.'"   Wildearth Guardians v. Kempthorne, 592 F. Supp. 2d 18, 23 (D.D.C. 2008) (quoting Willoughby v. Potomac Elec. Power Co., 100 F.3d 999, 1003 (D.C. Cir. 1996)).   "[A] court may deny a motion to file a supplemental complaint as futile 'if the proposed claim[s] would not survive a motion to dismiss.'"   BEG Invs., LLC v. Alberti, 85 F. Supp. 3d 13, 24 (D.D.C. 2015) (second alteration in original) (quoting Hettinga v. United States, 677 F.3d 471, 480 (D.C. Cir. 2012)).

"[F]oreign states are generally 'immune from' the jurisdiction of American courts . . . ." Cabrera v. Islamic Republic of Iran, Civ. A. Nos. 19-3835, 18-2065 (JDB), 2022 WL 2817730, at *33 (D.D.C. July 19, 2022) (quoting 28 U.S.C. § 1604).   The FSIA "defines the term 'foreign state' expansively."   GSS Grp. Ltd. v. Republic of Liber., 31 F. Supp. 3d 50, 57 (D.D.C. 2014) (citations omitted).   A foreign state "includes an agency or instrumentality of a foreign state," 28 U.S.C. § 1603(a), and an "agency or instrumentality of a foreign state" includes any entity "which

---

[2] Although this fact is not critical to the Court's analysis, the Court also notes that most of the materials GDGS included as exhibits to its supplemental memorandum could have been filed as exhibits to GDGS's original motion.  This critique does not apply to GDGS's information about Guila Fakhoury's February 2022 tweet stating that GDGS "kidnapped, tortured and killed" Amer Fakhoury "under direct orders from Hezbollah and #Iran," Suppl. Mem. in Supp. of Mot. to Strike Compl. at 2, but these allegations are essentially the same as ones already in the complaint, see Compl. ¶ 36 ("Today, Hezbollah, under Iran's control, is understood to be the de-facto dominant authority in Lebanon . . . ."), ¶ 53 (alleging that Hezbollah controls the security services and judiciary in Lebanon), ¶ 82 ("Defendant Iran, through . . . Hezbollah . . . intentionally ordered, directed, and caused the torture and subsequent death of Amer Fakhoury.").

is a separate legal person, corporate or otherwise," "which is an organ of a foreign state or political subdivision thereof," and "which is neither a citizen of a State of the United States . . . nor created under the laws of any third country," id. § 1603(b).  The parties have not disputed that GDGS, which described itself in this litigation as "an apolitical, executive agency in Lebanon, whose role and functions are akin to the U.S. Department of Homeland Security," Mot. to Strike Compl. at 1, qualifies as an "agency or instrumentality" of Lebanon that is presumptively entitled to sovereign immunity under the FSIA.

The FSIA "provides exceptions to [sovereign] immunity in 'sections 1605 to 1607' of Title 28." Cabrera, 2022 WL 2817730, at *33.  One such exception is the anti-terrorism exception outlined at 28 U.S.C. § 1605A.  This exception, which plaintiffs have invoked to claim that this Court has subject-matter jurisdiction to adjudicate their claims against Iran, Compl. ¶ 2, applies only when the "foreign state was designated as a state sponsor of terrorism at the time [the alleged wrongs] occurred, or was so designated as a result of such [wrongs]," 28 U.S.C. § 1605A(a)(2)(A)(i)(I).  Both parties agree that, because neither GSDS nor Lebanon has been designated as a state sponsor of terrorism, the anti-terrorism exception in § 1605A does not apply. GDGS' Mem. of L. in Opp'n to Mot. to File Suppl. Compl. [ECF No. 13] ("Opp'n to Mot. to File Suppl. Compl.") at 3; Reply in Further Supp. of Mot. for Leave to File Suppl. Compl. [ECF No. 15] ("Reply in Supp. of Mot. for Leave to File Suppl. Compl.") at 2.

Instead, plaintiffs claim that one of the FSIA's more general exceptions to sovereign immunity applies.  See Reply in Supp. of Mot. for Leave to File Suppl. Compl. at 2.  Under 28 U.S.C. § 1605(a)(1), "[a] foreign state shall not be immune from the jurisdiction of courts of the United States . . . [if] the foreign state has waived its immunity either explicitly or by implication." According to plaintiffs, Lebanon triggered this exception through its "voluntary appearance in this

action, its request to intervene, and its application for affirmative relief adjudicating merits issues in this case." Opp'n to Mot. to Strike Compl. at 3.[3]

GDGS's motion to intervene "for the limited purpose of moving to strike the allegations made against it in the complaint" does not contain any explicit waiver of sovereign immunity. Mot. to Strike Compl. at 1. Hence, § 1605(a)(1)'s exception applies only if GDGS's motion constituted a waiver of sovereign immunity "by implication." "The FSIA does not specifically define what will constitute a waiver 'by implication,' but [this] circuit has 'followed the virtually unanimous precedent construing the implied waiver provision narrowly.'" Khochinsky v. Republic of Pol., 1 F.4th 1, 8 (D.C. Cir. 2021) (quoting Creighton Ltd. v. Gov't of Qatar, 181 F.3d 118, 122 (D.C. Cir. 1999)). Inherent in the exception at 28 U.S.C. § 1605(a)(1) "is the requirement that the foreign state have intended to waive its sovereign immunity," id. (quoting Creighton Ltd., 181 F. 3d at 122), and "courts rarely find that a nation has waived its sovereign immunity . . . without strong evidence that this is what the foreign state intended," id. (alteration in original) (quoting Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438, 444 (D.C. Cir. 1990)).

The D.C. Circuit has recognized only three circumstances that constitute an implied waiver of sovereign immunity: "(1) executing a contract containing a choice-of-law clause designating the laws of the United States as applicable; (2) filing a responsive pleading without asserting sovereign immunity; or (3) agreeing to submit a dispute to arbitration in the United States." Ivanenko v. Yanukovich, 995 F.3d 232, 239 (D.C. Cir. 2021); accord Khochinsky, 1 F.4th at 8–9. "[C]ourts have been reluctant to stray beyond these examples when considering claims that a

---

[3] Plaintiffs also claim that GDGS's intervention means that the Court has personal jurisdiction over GDGS and Lebanon, Opp'n to Mot. to Strike Compl. at 3, but the Court need not consider that claim because it concludes it lacks subject-matter jurisdiction.

nation has implicitly waived its defense of sovereign immunity." Khochinsky, 1 F.4th at 9 (quoting World Wide Mins., Ltd. v. Republic of Kaz., 296 F.3d 1154, 1161 n.11 (D.C. Cir. 2002)).

None of these examples apply here. There is no relevant choice-of-law contract or arbitration agreement. And while GDGS moved to intervene in the hopes of having the Court strike allegations from the complaint, "pre-trial motions attacking the pleadings or seeking relief as to collateral matters are not responsive pleadings." Duda v. Bd. of Educ. of Franklin Park Pub. Sch. Dist. No. 84, 133 F.3d 1054, 1057 n.2 (7th Cir. 1998) (citation omitted).

Two other considerations support the Court's conclusion that plaintiffs' motion should be denied. First, some courts have permitted sovereigns to intervene in cases for limited purposes while maintaining their sovereign immunity. E.g., MGM Glob. Resorts Dev., LLC v. U.S. Dep't of the Interior, Civ. A. No. 19-2377 (RC), 2020 WL 5545496, at *5–6 (D.D.C. Sept. 16, 2020) (rejecting an "'all or nothing' approach to intervention"); Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton, 327 F. Supp. 2d 995, 1000 (W.D. Wis. 2004) ("[E]ntities [with sovereign immunity] may intervene for a limited purpose such as moving to dismiss the lawsuit for failure to join an indispensable party without waiving their sovereign immunity."), aff'd, 422 F.3d 490 (7th Cir. 2005). While there is disagreement about the legitimacy of this practice, see MGM Glob. Resorts, 2020 WL 5545496, at *5–6 (discussing disagreement); Jota v. Texaco, Inc., 157 F.3d 153, 163 (2d Cir. 1998) ("The Court had explicitly advised Ecuador that its unqualified participation in the litigation would be required to enable it to intervene, and Ecuador elected not to fully relinquish its sovereign immunity."), the debate's very existence undermines any suggestion that GDGS's motion constituted "strong evidence" of its intent to waive sovereign immunity, Khochinsky, 1 F.4th at 8 (citation omitted). Second, GDGS's motion makes clear that GDGS sought "limited intervention," Mot. to Strike Compl. at 3–4, for a "limited purpose," id. at

1.  Although the motion does not explicitly invoke GDGS's sovereign immunity, its precise and controlled language bolsters the Court's conclusion that GDGS did not intend for the motion to waive its sovereign immunity.

In sum, a motion to intervene for a limited purpose does not fall within any of the three circumstances the D.C. Circuit has recognized to constitute implied waivers of sovereign immunity, and there is insufficient evidence for the Court to conclude that GDGS intended to waive its sovereign immunity as required for the exception at 28 U.S.C. § 1605(a)(1) to apply. Hence, the Court would lack subject-matter jurisdiction to adjudicate plaintiffs' claims against GDGS and Lebanon, and these claims would not survive a motion to dismiss.  Cf. Fed. R. Civ. P. 12(b)(1), (h)(3).  The Court consequently will deny plaintiffs' motion for leave to file a supplemental complaint as futile.[4]

## III.    GDGS's Motion to Intervene and to Strike

GDGS's first motion contains two requests.  See Mot. to Strike Compl. at 1.  The first request is for permission to intervene in this case pursuant to Federal Rule of Civil Procedure 24. Id. at 1, 3–4.  Assuming it receives permission to intervene, GDGS intends to request that the Court strike paragraphs 48 through 55 and 62 of the complaint pursuant to Federal Rule of Civil Procedure 12(f).  Id. at 1, 5–11.  But Rule 12(f)(1) explicitly permits a court to strike allegations sua sponte, Jenkins v. City of Las Vegas, 333 F.R.D. 544, 548 (D.N.M. 2019), and GDGS has accordingly stated that "the Court need not determine GDGS' status as an intervenor to decide the motion to strike under Rule 12(f)," Reply in Supp. of Mot. to Strike Compl. at 2.  The Court agrees and will not decide whether GDGS should be granted permission to intervene under Rule 24.

---

[4] Because the Court concludes that GDGS's motion did not waive its sovereign immunity, the Court need not and does not decide whether any waiver of sovereign immunity by GDGS would apply to Lebanon.  But see Mot. to File Suppl. Compl. at 1–2 (arguing that GDGS's motion waived both GDGS's and Lebanon's sovereign immunity).

Rule 12(f) provides that a court "may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter."  "A court has broad discretion in ruling on a motion to strike," Uzlyan v. Solis, 706 F. Supp. 2d 44, 51 (D.D.C. 2010), and "motions to strike are particularly 'disfavored' by the federal courts," Campaign Legal Ctr. v. Iowa Values, 573 F. Supp. 3d 243, 252 (D.D.C. 2021) (quoting Wiggins v. Philip Morris, Inc., 853 F. Supp. 457, 457 (D.D.C. 1994)); see also United States v. Three Sums Totaling $612,168.23 in Seized U.S. Currency, Civ. A. No. 19-130 (RBW), 2021 WL 2255310, at *4 (D.D.C. June 3, 2021) ("[A]bsent a 'strong reason for so doing,' courts will generally 'not tamper with pleadings.'" (citation omitted)).  "In considering a motion to strike, courts will draw all reasonable inferences in the pleader's favor and resolve all doubts in favor of denial of the motion to strike."  Crawford v. Barr, Civ. A. No. 17-798 (JEB), 2019 WL 6525652, at *4 (D.D.C. Dec. 4, 2019) (quoting Moore v. United States, 318 F. Supp. 3d 188, 190–91 (D.D.C. 2018)).  "Only if the allegations in a complaint are both irrelevant and prejudicial . . . will a motion to strike be granted."  Campaign Legal Ctr., 573 F. Supp. 3d at 252.

Allegations are irrelevant in the motion-to-strike context when "'it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation' or . . . 'it can be shown that no evidence in support of the allegation would be admissible.'"  Jackson v. Starbucks Corp., Civ. A. No. 19-1487, 2020 WL 3791873, at *4 (D.D.C. July 7, 2020) (quoting Cobell v. Norton, 224 F.R.D 1, 2–3 (D.D.C. 2004)).  An allegation is prejudicial or "scandalous" when it "unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court."  Uzlyan, 706 F. Supp. 2d at 58 (quoting Pigford v. Veneman, 215 F.R.D. 2, 4 (D.D.C. 2003)); accord Allen v. Addi, Civ. A. No. 20-cv-01650 (TSC), 2021 WL 5911175, at *4 (D.D.C. Nov. 23, 2021) (explaining that for a

statement to be stricken as scandalous, it must contain unnecessary allegations that reflect on an entity's moral character and must lack evidentiary support).

Broadly speaking, GDGS makes three arguments in support of striking the allegations in paragraphs 48 through 55 and 62 of the complaint.  Most significantly, GDGS argues that plaintiffs' allegations about Fakhoury's detention in Lebanon are irrelevant to plaintiffs' claims against Iran.  Mot. to Strike Compl. at 11 ("[N]one of [plaintiffs'] statements have any bearing on the merits of the case in general.  Plaintiffs' attacks on GDGS cannot and do not advance their claims against the Defendant Iran . . . .").  But this argument is premised on the faulty assumption that plaintiffs "do not allege any connection between GDGS and Hezbollah."  Id.; see also id. (stating GDGS has "no association with Defendant Iran, and an even further dissociation with conduct or activities of the designated terrorist organizations referred to in the Complaint").  In fact, several paragraphs of the complaint allege such connections between Iran, Hezbollah, and GDGS/Lebanon as a whole.[5]  Some of these allegations are the ones GDGS wishes to strike from the complaint, e.g., Compl. ¶¶ 53, 62, but others are not, e.g., id. ¶¶ 34, 36, 59.  Regardless, none of these allegations is irrelevant to plaintiffs' claims.  Plaintiffs' theory of liability is that Iran controls Hezbollah, Hezbollah controls Lebanon, and Lebanese agencies and officials—under the direction of Hezbollah and Iran—kidnapped, tortured, and killed Fakhoury.  Id. ¶¶ 34, 36, 59, 62, 82–84, 89.  Far from having "no possible bearing on the subject matter of the litigation," Jackson,

---

[5] E.g., Compl. ¶ 34 ("Iran continues today to utilize Hezbollah as a military and terrorist force to influence regional politics . . . .  All aspects of Hezbollah's programs and activities are coordinated and approved by Tehran."), ¶ 36 ("Today, Hezbollah, under Iran's control, is understood to be the de-facto dominant authority in Lebanon whose policies and goals usurp those advanced by its democratically elected officials. . . .  The Lebanon of today cannot be considered an independent nation . . . ."), ¶ 53 (referring to "Hezbollah-controlled security services and judiciary"), ¶ 59 (stating Hezbollah "used" the head of GDGS to negotiate Fakhoury's release as part of a prisoner swap), ¶ 62 ("Hezbollah, which has a 'wing' in the intelligence service, was involved in all aspects of the unlawful incarceration of Amer Fakhoury, as well as the quid-pro-quo prisoner exchange that secured Amer Fakhoury's release."), ¶¶ 71–73, 77–80 (describing Iran's provision of support to Hezbollah and Iran's use of Hezbollah as a proxy).

2020 WL 3791873, at *4 (citation omitted), the allegations about Fakhoury's detention in Lebanon that GDGS wishes to strike are central to this lawsuit.

GDGS also argues that many of plaintiffs' allegations are untrue.  Mot. to Strike Compl. at 2, 8, 11.  In particular, GDGS focuses on plaintiffs' allegation that Fakhoury was detained in order to negotiate a quid-pro-quo prisoner exchange for Tajideen.  Id. at 8; Reply in Supp. of Mot. to Strike Compl. at 10–11.  GDGS states that Tajideen's attorneys and the U.S. State Department have publicly denounced the claim that Tajideen was released in exchange for Fakhoury, Mot. to Strike Compl. at 8, and it points out that a judge in this District granted Tajideen's compassionate release motion, Reply in Supp. of Mot. to Strike Compl. at 10–11; see also Order at 1, United States v. Tajideen, Crim. A. No. 17-46-1 (RBW) (D.D.C. May 28, 2020), ECF No. 264.  These claims certainly undermine plaintiffs' allegations about Tajideen.  But, as plaintiffs argue, even if Tajideen's release was coincidental, "that does not mean that the detention of [Fakhoury] was not perpetrated in the first place for the purpose of securing Tajideen's [or another prisoner's] release." Opp'n to Mot. to Strike Compl. at 8–9; see also Simpson v. Socialist People's Libyan Arab Jamahiriya, 470 F.3d 356, 357 (D.C. Cir. 2006) ("[T]he FSIA definition of hostage taking . . . focuses on the state of mind of the hostage taker, [so] a plaintiff need not show that the hostage taker communicated a demand reflecting the hostage taker's intended purpose to a third party."); Fritz v. Islamic Republic of Iran, 320 F. Supp. 3d 48, 78–79 (D.D.C. 2018) (explaining that the FSIA does not require a plaintiff to show that a captor succeeded in compelling a third party to act or abstain from acting in order to establish a successful hostage-taking claim).  GDGS's arguments

about the true reason for Tajideen's release thus are not fatal to plaintiffs' claims,[6] and GDGS's more general denials of plaintiffs' allegations about Hezbollah's influence in Lebanon do not convince the Court to strike portions of plaintiffs' complaint.

GDGS's final broad argument is that, even if plaintiffs' allegations are accepted as true, "the alleged conduct by GDGS could not rise to the level of actionable conduct under the FSIA." Mot. to Strike Compl. at 5. GDGS argues that Fakhoury's detention does not fit within the hostage-taking claims permitted under the FSIA because "he was lawfully detained for investigatory purposes and ultimately handed off to another agency." Id. at 6. GDGS similarly argues that the abuses Fakhoury allegedly suffered at the hands of GDGS were not severe enough to constitute torture, id. at 9–10, and that GDGS did not deliberately kill Fakhoury "by any stretch of the imagination," id. at 10. There are two fatal problems with this argument, however. First, despite GDGS's argument that plaintiffs' claims fail "even if any or all of Plaintiffs' allegations about GDGS were accurate," id. at 11, GDGS's arguments about the legitimacy of Fakhoury's detention contradict plaintiffs' complaint, see Compl. ¶¶ 47–48, 62 ("Hezbollah . . . was involved in all

---

[6] The Court is similarly not swayed by GDGS's argument that because "Hezbollah condemned Amer's release," Compl. ¶ 61, it "makes no logical sense" that Hezbollah would have taken Fakhoury as a hostage, Mot. to Strike Compl. at 7–8. The Court cannot rule out the possibility that Hezbollah's public condemnation obscured its true role in negotiating Fakhoury's release, see Opp'n to Mot. to Strike Compl. at 8 (stating prisoner exchanges are "typically done quietly and behind the scenes, and with plausible deniability in the official record"), and even if Hezbollah's condemnation was sincere, that does not preclude the possibility that Hezbollah detained Fakhoury with the intention of compelling a third party to take or abstain from taking some action.

aspects of the unlawful incarceration of Amer Fakhoury . . . .").  The Court will not resolve factual disputes in favor of striking plaintiffs' allegations.[7]  See Crawford, 2019 WL 6525652, at *4.

Second, GDGS's arguments about the legal sufficiency of the claims against GDGS ignore the fact that GDGS is not a defendant in this case.  Plaintiffs do not need to prove that GDGS is liable under the FSIA in order to prove that Iran is.  GDGS's singular focus on the allegations involving it also obscures the fact that plaintiffs have alleged that Iran is responsible for all the harms Fakhoury allegedly suffered.  Compare Mot. to Strike Compl. at 10 ("Whether or not Mr. Fakhoury's subsequent treatment when he was no longer in GDGS's custody amount[s] to sufficient allegations are of no moment, given the allegations as to his time with GDGS, standing alone, are insufficient under the FSIA . . . ."), with Compl. ¶¶ 62, 82–85 (blaming Iran and Hezbollah for the harms Fakhoury suffered).  Even if it is true that Fakhoury was in GDGS's custody for "less than a single day," Reply in Supp. of Mot. to Strike Compl. at 8, his limited detention by GDGS still forms a part of plaintiffs' overarching and consolidated claim against Iran.  Hence, these allegations are not irrelevant, and the Court will not segment the complaint into discrete allegations against separate Lebanese entities when the only defendant in this case is Iran.

Plaintiffs' allegations about Fakhoury's detention and the ties between Iran, Hezbollah, and Lebanon have obviously offended GDGS.  But these claims are not irrelevant to plaintiffs'

---

[7] In its reply, GDGS cursorily states that plaintiffs' complaint describes GDGS activities that are "immune from this Court's inquiry pursuant to the act-of-state doctrine."  Reply in Supp. of Mot. to Strike. Compl. at 10.  "The act of state doctrine 'precludes the courts of this country from inquiring into the validity of the public acts  a recognized foreign sovereign power committed within its own territory.'"  World Wide Mins., 296 F.3d at 1164 (citation omitted).  The Court will not consider this argument at this time for two reasons.  First, GDGS made the argument for the first time in its reply.  "Considering an argument advanced for the first time in a reply brief . . . is not only unfair . . . , but also entails the risk of an improvident or ill-advised opinion on the legal issues tendered.  McBride v. Merrel Dow & Pharms., Inc., 800 F.2d 1208, 1211 (D.C. Cir. 1986) (internal citation omitted).  Second, whether the act-of-state doctrine precludes this Court from deciding the legitimacy of Fakhoury's detention in Lebanon is not an appropriate issue for the Court to decide when considering a motion to strike.  The Court's task is to determine whether plaintiffs' allegations are irrelevant and prejudicial, Campaign Legal Ctr., 573 F. Supp. 3d at 252, not whether the allegations are precluded on the merits, cf. Wultz v. Islamic Republic of Iran, 755 F. Supp. 2d 1, 52 n.9 (D.D.C. 2010) ("[T]he act-of-state doctrine grows out of separation-of-powers concerns [and] 'provides foreign states with a substantive defense on the merits.'" (quoting Republic of Austria v. Altmann, 541 U.S. 677, 700 (2004))).

litigation against Iran—they lie at the heart of plaintiffs' complaint.  And because plaintiffs' allegations are central to this lawsuit and are not framed using needlessly inflammatory language, they do not "unnecessarily reflect on the moral character" of GDGS or Lebanon as would be required for them to be considered "scandalous."  <u>Allen</u>, 2021 WL 5911175, at *4 (citation omitted) (cleaned up); <u>see also</u> <u>Uzlyan</u>, 706 F. Supp. 2d at 58 ("In the absence of pejorative adjectives characterizing the facts alleged or other colorful language, the fact that a plaintiff's allegations may cast [an entity] in a 'derogatory light' is insufficient to warrant the striking of allegations from a complaint.").  While the Court appreciates that GDGS believes—and the Court may one day conclude—that most of plaintiffs' allegations are false, that does not mean that the allegations should be struck at this time under Rule 12(f).  <u>See</u> <u>Crawford</u>, 2019 WL 6525652, at *4.

### <u>Conclusion</u>

For the foregoing reasons, the Court will deny GDGS's motion to intervene and to strike, deny plaintiffs' motion to file a supplemental complaint, and grant plaintiffs' motion to strike GDGS's supplemental memorandum.  A separate Order will issue on this date.

/s/

JOHN D. BATES
United States District Judge

Dated:  <u>August 15, 2022</u>