## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ESTATE OF AMER FAKHOURY et al.,**

    **Plaintiffs,**

       v.

**ISLAMIC REPUBLIC OF IRAN,**

    **Defendant.**

**Civil Action No. 21-1218 (JDB)**

## <u>MEMORANDUM OPINION</u>

Amer Fakhoury was a healthy fifty-six-year-old man when he left the United States for Lebanon in early September 2019 to visit family he hadn't seen in twenty years.  Decl. of Guila Fakhoury [ECF No. 34] ("Guila Decl.") ¶ 25; Decl. of Micheline Elias [ECF No. 33] ("Elias Decl.") ¶ 5.  He returned to the United States six months later "a broken man" suffering from stage IV lymphoma.  Elias Decl. ¶¶ 33, 35.  He died of cancer five months after his return.  Id. ¶ 37.

Fakhoury's estate and family sued the Islamic Republic of Iran for Fakhoury's suffering and death.  They contend that Iran materially supported Hezbollah, which in turn abducted Fakhoury in Lebanon, beat him and held him in unsanitary conditions, ignored clear signs of his deteriorating health, and thereby caused his eventual death by cancer.  And that mistreatment, they say, constituted both torture and hostage-taking—abrogating Iran's sovereign immunity under the terrorism exception in the Foreign Sovereign Immunities Act (FSIA).  See 28 U.S.C. § 1605A.

As it often does, Iran declined to participate in the litigation, leaving the plaintiffs to move for a default judgment.  For the reasons that follow, the Court determines the plaintiffs have shown that Hezbollah took Fakhoury hostage but not that it tortured him.  And the plaintiffs have shown

1

that Iran materially supported Hezbollah and therefore is responsible under the FSIA for Hezbollah's treatment of Fakhoury. Meanwhile, they have shown that Fakhoury's time as a hostage caused personal injury but have failed to make the same showing as to his death. The Court therefore possesses jurisdiction and the plaintiffs possess a private right of action and are entitled to a default judgment. But further briefing is necessary to allot appropriate damages.

## Factual Background

Amer Fakhoury was born and raised in Lebanon. Compl. [ECF No. 1] ¶ 12. In his youth, Fakhoury served in the South Lebanese Army (SLA), a group that frequently came into conflict with Hezbollah, an Iranian-backed terrorist organization with extensive operations in Lebanon. Elias Decl. ¶ 3; Decl. of Hanin Ghaddar [ECF No. 31] ("Ghaddar Decl.") ¶¶ 17, 20.[1] His service included time on the staff at Khiam prison, an SLA base for its operations against Hezbollah and other militant groups. Ghaddar Decl. ¶¶ 19–20. At Khiam, "torture was common." Id. ¶ 23. But by all accounts before this Court, Fakhoury played a purely administrative role at Khiam, with no interactions with prisoners—and no participation in that torture. Id. ¶ 23.

Nonetheless, Fakhoury's SLA membership made him and his family—his wife Micheline Elias and their daughters Guila, Amanda, Zoya, and Macy—a target as Hezbollah's power in Lebanon increased. Id. ¶ 22. So the Fakhoury family emigrated from Lebanon to the United States in the late 1990s. Id.; Elias Decl. ¶ 2. Since then, each member of the family obtained United States citizenship. See Decl. of Robert J. Tolchin [ECF No. 29] ("Tolchin Decl. I") ¶ 2; Decl. of Robert J. Tolchin [ECF No. 39] ("Tolchin Decl. II") ¶ 2.

---

[1] The record sometimes refers to plaintiffs' expert Hanin Ghaddar as Hanin "Ghadar." See, e.g., Ghaddar Decl. at 1, 15. Because Ms. Ghaddar's signature and publicly available sources spell her name "Ghaddar," the Court adopts this spelling.

Fear of Hezbollah prevented Fakhoury from returning to Lebanon for twenty years, during which time Fakhoury missed the passing of his parents and never saw his brother. Elias Decl. ¶¶ 2–3, 5. But by 2019, the threat seemed to have dissipated: Lebanon's president publicly encouraged former SLA members to return to their homeland; the U.S. Embassy in Beirut assured Fakhoury that he could return safely; a Lebanese general who was a Fakhoury family friend confirmed the same; and the family's lawyer agreed. Id. ¶ 4. Reassurances in hand, the Fakhoury family decided it was time to pay a visit to Lebanon to see long-missed family.

The trip quickly turned worrisome. When the family landed in Beirut on September 4, 2019, airport security informed Fakhoury that they needed to retain his passport for what they called a "routine procedure" resulting from his long absence from the country. Id. ¶ 6. He was told to return a week later to retrieve the passport. Id. Fakhoury complied and returned on September 11, only to be told that his passport was not ready and that he should return the next morning. Id. ¶ 7.

Early the next morning, a Lebanese newspaper that the plaintiffs characterize as "Hezbollah backed" published an article dubbing Fakhoury "the Butcher of Khiam" and claiming that he had tortured prisoners at the Khiam prison decades prior. Id. ¶ 8; Guila Decl. ¶ 34; Decl. of Zoya Fakhoury [ECF No. 37] ("Zoya Decl.") ¶ 6. Worried by the accusations, Fakhoury decided to speak with the U.S. Embassy before returning to the airport to retrieve his passport. Elias Decl. ¶ 8. But the Lebanese general the family had befriended drove Fakhoury to the airport instead of the Embassy, apparently against Fakhoury's will. Id.

Fakhoury did not return from the airport, and what followed for the Fakhoury family was an extended and unwelcome silence. Unable to reach Fakhoury, the family began to worry in earnest, even contacting a United States senator who pressured the Lebanese government for

information.  Id. ¶ 10.  About forty-eight hours after Fakhoury left for the airport, the Lebanese government conveyed that he was detained in a military prison on charges relating to his alleged conduct as an employee at Khiam prison and as an agent of Israel.  Id. ¶¶ 10–11.[2]

Because Fakhoury's daughters soon had to return to the United States—and because Fakhoury himself did not survive long past this ordeal—much of what we know next comes through the eyes of Fakhoury's wife Micheline Elias, as recited in her sworn declaration.  Elias first saw Fakhoury ten days into his detention, when she was allowed to visit him in the military prison.  Id. ¶ 12.  Fakhoury's state betrayed the poor conditions in which he was held: as Elias describes it, Fakhoury "had red bug bites all over his body and he was itchy all over."  Id. ¶ 13.  And, she says, she "could see from the look in his eyes that he had been tortured."  Id.

Over the following months, Elias visited Fakhoury in prison nearly every day.  Id. ¶ 17.  It was a harrowing time—not only because Elias was frequently turned away without reason, and not only because she was isolated from her incarcerated husband and far-away children, but also because Fakhoury's health was visibly deteriorating.  Id. ¶¶ 18–19.  He was losing weight, complaining of stomach pain, and coughing and excreting blood.  Id. ¶¶ 20–21.[3]

After advocacy from Elias and intervention from United States officials, the Lebanese government permitted Fakhoury to have a blood test done at a military hospital.  Id. ¶¶ 21–22; Guila Decl. ¶ 15–16.  Elias sent the resulting report to her daughter Guila, who is a scientist; Guila claims to have identified in the report concerning signs of lymphoma and urged the prison to

---

[2] The plaintiffs' expert and briefs date the beginning of Fakhoury's detention to September 4, 2019.  See Ghaddar Decl. ¶ 13; Pls.' Mem. of L. in Supp. of Mot. for J. by Default [ECF No. 41] at 2.  This telling contradicts the consistent timeline relayed by each member of the Fakhoury family—all of whom explain that the family arrived in Lebanon on September 4 but traveled freely for a week before Fakhoury's detention on September 12—so the Court disregards the September 4 date.  See, e.g., Elias Decl. ¶¶ 7–8; Decl. of Macy Fakhoury [ECF No. 36] ¶ 8.

[3] As is true of much in this record, the precise details of Fakhoury's decline are unclear.  Elias recounts a loss of forty pounds over two months, see Elias Decl. ¶ 21, while Fakhoury's daughter Guila gives numbers ranging from sixty-five to eighty pounds over that same period, see Guila Decl. ¶ 14–15.

transport Fakhoury to a hospital for treatment.  Elias Decl. ¶ 22; Guila Decl. ¶ 16.  The prison acquiesced and moved Fakhoury to the military hospital, where Elias was not allowed to see him for the next ten days.  Elias Decl. ¶ 23.  When she saw him, Fakhoury was in bad shape: he "could not walk or sleep," was in serious pain, and, says Elias, "was all bones."  Id.  Meanwhile, in Elias's opinion, the treatment was inadequate; Elias questioned, for instance, why Fakhoury did not have intravenous therapy or the chemotherapy she believed he required.  Id. ¶¶ 23–25.

Eventually, Fakhoury was moved to a private hospital, which, in January 2020—approximately four months after Fakhoury's initial detention—diagnosed Fakhoury with stage IV lymphoma.  Id. ¶¶ 28–29.  Elias continued to struggle to get Fakhoury the treatment she believed he needed at various hospitals—sometimes having to move him due to safety concerns—for the duration of their time in Lebanon.  Id. ¶¶ 29–30.[4]

That time came to a welcome end in March 2020, when Fakhoury and Elias received word from the U.S. Embassy that Fakhoury would be freed.  Id. ¶¶ 31–33.  On March 16, Fakhoury and Elias were flown home to the United States.  Id. ¶ 33.  Back stateside, Fakhoury spent his final months battling both cancer and stress, sometimes (according to his daughter and wife) waking in the middle of the night screaming in fear of prison guards.  Id. ¶ 35; Guila Decl. ¶ 22.  Despite additional cancer treatment in the United States, Fakhoury passed away on August 17, 2020—five months after returning home and more than eleven months after he was first detained.  Elias Decl. ¶ 37.

Although Fakhoury's detention took place in Lebanon, the Fakhoury family attributes Fakhoury's mistreatment to Iran.  According to the plaintiffs' experts and evidence adopted from other cases, Iran materially supports Hezbollah in pursuit of their shared goals of weakening

---

[4] As best the Court can tell from the record, Fakhoury and Elias had relative autonomy over where they sought treatment within Lebanon, but were not permitted to leave Lebanon during this period.

American influence in the Middle East, replacing Israel with an Islamic state, and committing "acts of terrorism against American citizens in Lebanon." Decl. of Patrick Clawson [ECF No. 30] ("Clawson Decl.") ¶¶ 20, 23, 46–47, 49–50, 66. And Hezbollah, in turn, has infiltrated portions of the Lebanese security state to the extent that it can sometimes "dictate[] the state's security and military decisions"—including Fakhoury's detention. Ghaddar Decl. ¶¶ 3–4.

### Procedural Background

The Fakhoury family brought this suit against the Islamic Republic of Iran.[5] The complaint alleges that Fakhoury's treatment in Lebanon came at the instruction of Hezbollah, a militant group with significant pull over sectors of the Lebanese government; and that Iran, in turn, supported and directed Hezbollah. See Compl. ¶ 1. The plaintiffs served Iran,[6] which failed to appear, resulting in the entry of a default. See Default [ECF No. 26]; cf. Maalouf v. Islamic Republic of Iran, 923 F.3d 1095, 1102–03 (D.C. Cir. 2019) (observing that Iran, a "frequent defendant" in similar cases, "repeatedly fail[s] to appear"). The plaintiffs then moved for a default judgment. See Pls.' Mem. of L. in Supp. of Mot. for J. by Default [ECF No. 41] ("Mot."). With the motion, the plaintiffs filed a number of exhibits: declarations by each member of Fakhoury's immediate family, see ECF Nos. 33–37; declarations by three experts, two regarding Iran's liability and one psychiatric evaluation of the toll these events took on the Fakhoury family, see ECF Nos. 30–32; and declarations and transcripts from other cases involving Hezbollah and Iran, see ECF No. 38.[7] Those materials form the record on which this Court now resolves the motion for default judgment.

---

[5] The plaintiffs are Fakhoury's estate; Fakhoury's wife Micheline Elias, on her own behalf and on behalf of their two minor children; and two of their adult daughters, Guila and Amanda Fakhoury. See Compl.

[6] See Letter from Jared N. Hess, Att'y Adviser, Off. of the Legal Adviser, U.S. Dep't of State, to Angela D. Caesar, Clerk of Ct., United States Dist. Ct. for the Dist. of Columbia (July 25, 2023) [ECF No. 21] ("Service Letter").

[7] The Court may rely on materials submitted in earlier cases but may not mechanically accept earlier courts' conclusions therefrom. Sotloff v. Syrian Arab Republic, 525 F. Supp. 3d 121, 127 n.2 (D.D.C. 2021).

See Mot. at 18 (urging the Court to resolve the motion "based on documentary evidence without a hearing").

## Analysis

As a foreign sovereign, Iran enjoys "a presumption of foreign sovereign immunity." Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 87 (D.C. Cir. 2002). But its immunity is not absolute: the FSIA qualifies sovereign immunity through various exceptions. Id. The exception invoked here is the "terrorism exception," which abrogates a foreign state's immunity from an action "for personal injury or death" under the following conditions: the personal injury or death must have been "caused by," as relevant here, an act of "torture" or "hostage taking"; the foreign state or its "official, employee, or agent" must have committed or materially supported the act while acting in an official capacity; the state must have then been and still remain "designated as a state sponsor of terrorism"; and the claimant or victim must at the time of the act have been, among other things, "a national of the United States." 28 U.S.C. § 1605A(a); see Fritz v. Islamic Republic of Iran, 320 F. Supp. 3d 48, 77 (D.D.C. 2018).[8] If each condition is satisfied, the foreign state loses immunity, American courts gain subject matter jurisdiction, and a U.S.-national claimant obtains a private right of action against the state. 28 U.S.C. § 1605A(c); see Borochov v. Islamic Republic of Iran, 94 F.4th 1053, 1060 (D.C. Cir. 2024).

Given the sensitive international-relations waters in which these cases tread, courts construe this exception "narrowly" and seek to avoid "open[ing] the door to litigation against foreign governments that the Political Branches have not clearly authorized." Borochov, 94 F.4th at 1062. That said, a plaintiff's evidentiary burden in a default-judgment case like this one is not

---

[8] If the act of terrorism "occurred in the foreign state against which the claim has been brought," then the plaintiff must also "afford[] the foreign state a reasonable opportunity to arbitrate the claim" before immunity is abrogated. 28 U.S.C. § 1605A(a)(2)(iii). The defendant here is Iran and the acts occurred in Lebanon, so this requirement does not apply.

high.  The plaintiff bears a "rather modest burden of production"—less than a preponderance of the evidence—to establish jurisdictional facts.  Owens v. Republic of Sudan, 864 F.3d 751, 784 (D.C. Cir. 2017), vacated on other grounds, Opati v. Republic of Sudan, 140 S. Ct. 1601 (2020).  Once that burden of production is met, a defaulting sovereign necessarily—by virtue of its default—fails its "burden of persuasion to show that the exception" to sovereign immunity does not apply, so "jurisdiction attaches" at that point.  Id.  And once jurisdiction attaches, a plaintiff is entitled to a default judgment if he proves liability "by evidence satisfactory to the court," 28 U.S.C. § 1608(e); Borochov, 94 F.4th at 1058—an unusually flexible standard that makes the court's role something akin to "a screening function," Maalouf, 923 F.3d at 1113.  It is generally thought that establishing jurisdiction under the terrorism exception simultaneously establishes entitlement to a default judgment on the merits.  See Fritz, 320 F. Supp. 3d at 86.

At both the jurisdictional and liability stages, the unique FSIA default-judgment setting gives courts "an unusual degree of discretion over evidentiary rulings."  Owens, 864 F.3d at 785.  Still, it does not invite evidentiary anarchy: facts must be proven "upon evidence admissible under the Federal Rules of Evidence."  Id. at 785–86; see also Warmbier v. Democratic People's Republic of Korea, 356 F. Supp. 3d 30, 42 (D.D.C. 2018) ("Uncontroverted factual allegations that are supported by admissible evidence are taken as true.").

## I.    Jurisdiction

Begin with the easy parts.  Iran was at all relevant times (and remains) a designated state sponsor of terrorism.  See Cabrera v. Islamic Republic of Iran, Civ. A. No. 19-3835 (JDB), 2022 WL 2817730, at *9 (D.D.C. July 19, 2022).  And each plaintiff was (and remains) a United States citizen, and therefore a national of the United States.  See Tolchin Decl. I ¶ 2; Tolchin Decl. II ¶ 2. So the questions that will determine Iran's vulnerability to suit are whether Hezbollah tortured or

took Fakhoury hostage, whether those acts can be attributed to material support from Iran, and whether those acts proximately caused one or more of the plaintiffs to suffer personal injury or death.  See Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123, 1128 (D.C. Cir. 2004) (establishing proximate causation standard for FSIA jurisdictional inquiry).

As outlined below, Fakhoury was not tortured but was taken hostage within the meaning of the FSIA; that act of hostage-taking can be attributed to Iran via its material support for Hezbollah; and as a result Fakhoury suffered personal injury but not death.  That is enough to grant the Court jurisdiction and the plaintiffs a private right of action and entitlement to a default judgment.  See 28 U.S.C. § 1605A(a), (c); Warmbier, 356 F. Supp. 3d at 54 (in this context, "the elements of immunity and liability are essentially the same" (cleaned up)).  But because the resulting damages will be significantly different than the briefing assumes, supplemental briefing on damages is necessary following this opinion.

### A.    Fakhoury was not tortured within the FSIA's meaning.

The FSIA incorporates the stringent definition of torture found in the Torture Victim Protection Act, see 28 U.S.C. § 1605A(h)(7), which defines as torture "any act, directed against an individual in the offender's custody or physical control by which severe pain or suffering . . . is intentionally inflicted on that individual," Pub. L. No. 102-256, § 3(b)(1), 106 Stat. 73, 73 (1992); see Mohammadi v. Islamic Republic of Iran, 782 F.3d 9, 16 (D.C. Cir. 2015).  This definition features four elements.  "First, the pain or suffering must be inflicted while the victim is in the offender's custody or physical control.  Second, the pain or suffering must be directed against the individual, i.e., the defendant must have targeted the victim.  Third, the purpose for inflicting the pain or suffering must be one of those mentioned in the statute—to obtain information or a confession, to punish, to intimidate or coerce, or to discriminate—or any non-enumerated purpose

similar in nature to those mentioned.  Fourth, the pain or suffering inflicted must be severe." Radmanesh v. Islamic Republic of Iran, 6 F.4th 1338, 1342–43 (D.C. Cir. 2021) (cleaned up).

This final "severity" requirement "is both demanding and important": it covers "extreme, deliberate and unusually cruel practices, for example, sustained systemic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain." Id. at 1343 (quoting Price, 294 F.3d at 92–93).  Wrongful treatment like "kicking, clubbing, and beatings," as well as interrogation while being held incommunicado, threatened with death, and forcibly separated from one's spouse have been held merely to "reflect a bent toward cruelty" short of torture.  Id. (first citing Price, 294 F.3d at 93–94; and then citing Simpson v. Socialist People's Libyan Arab Jamahiriya, 326 F.3d 230, 234 (D.C. Cir. 2003)).  The same is true of a single assault resulting in "hospitalization and treatment for cracked ribs, contusions, lacerations, and a concussion."  Id.  In short, "[n]ot all police brutality, not every instance of excessive force used against prisoners, is torture under the FSIA."  Price, 294 F.3d at 93.  Instead, "maltreatment is actionable under the FSIA only if purposeful and particularly harsh."  Han Kim v. Democratic People's Republic of Korea, 774 F.3d 1044, 1050 (D.C. Cir. 2014).

The evidence properly before the Court does not establish that Fakhoury was tortured within that "rigorous definition."  Radmanesh, 6 F.4th at 1343 (quoting Price, 294 F.3d at 93–94). We know from Elias's affidavit that Fakhoury's health declined precipitously and visibly over the course of his imprisonment in Lebanon.  Elias Decl. ¶ 20.  And we can infer that his conditions of confinement were less than sanitary from Elias's testimony that when she visited Fakhoury in prison Fakhoury "had red bug bites all over his body and he was itchy all over," id. ¶ 13, as well as an expert's opinion that unhealthy conditions are common in Lebanese prisons, see Ghaddar Decl. ¶ 14; cf. Han Kim, 774 F.3d at 1049–51 (relying on expert evidence that a regime routinely

subjects its prisoners to certain treatment). But while both inadequate health care and subpar prison conditions are objectionable, neither amounts to torture: this treatment falls short both of torture's severity requirement and the requirement that torture be directed <u>at</u> an individual for a prohibited <u>purpose</u>. <u>See</u> <u>Price</u>, 294 F.3d at 86, 94 ("deplorable conditions while incarcerated" not torture).

Understandably, the plaintiffs do not point primarily to that mistreatment to support their torture claim. Instead, they say that in his first day of detention Fakhoury was beaten, held at gun point, and forced to sign a false confession that he was not allowed to read. Elias Decl. ¶ 16; Decl. of Amanda Fakhoury [ECF No. 35] ("Amanda Decl.") ¶ 16. But no evidence of this beating is properly before the Court: these allegations simply parrot what Fakhoury apparently told his family, <u>see</u> Elias Decl. ¶ 16, making them quintessential inadmissible hearsay, <u>see</u> <u>Alinejad v.</u> <u>Islamic Republic of Iran</u>, Civ. A. No. 19-3599 (GMH), 2023 WL 4684929, at *15 (D.D.C. July 6, 2023).

The Court is sensitive to the evidentiary limitations that accompany "cases of forced disappearance, like this one, where direct evidence of subsequent torture . . . will, by definition, almost always be unavailable." <u>Han Kim</u>, 774 F.3d at 1048; <u>see also</u> <u>Alinejad</u>, 2023 WL 4684929, at *13. Such cases permit more evidentiary creativity because defendants should not be able to "effectively immunize themselves by killing their victims, intimidating witnesses, and refusing to appear in court." <u>Han Kim</u>, 774 F.3d at 1048; <u>see also</u> <u>Fritz</u>, 320 F. Supp. 3d at 82. Assume for the moment, then, that Fakhoury was beaten upon his initial detention—drawing liberal inferences from family members' assertions that Fakhoury emerged from incarceration with broken ribs and that they could "see from the look in his eyes that he had been tortured," and from a non-medical expert's speculation that Fakhoury's symptoms "indicate[] that [he] was beaten during the first few days of his detention." <u>See</u> Elias Decl. ¶¶ 13, 16; Amanda Decl. ¶ 16; Ghaddar Decl. ¶ 14. Yet

that factual scenario still would fall short of the FSIA's definition of torture: the D.C. Circuit has made clear that similar isolated beatings, though cruel, do not meet the severity requirement for torture.  Radmanesh, 6 F.4th at 1343.  The FSIA abrogates immunity for acts of torture, not all wrongful treatment, and the record before this Court does not clear the bar.[9]

Accordingly, the plaintiffs have failed to establish that Fakhoury was tortured under the FSIA's stringent definition.

### B.    Fakhoury was taken hostage within the FSIA's meaning.

The plaintiffs, however, do not rely exclusively on allegations of torture to abrogate Iran's immunity.  They also assert that Fakhoury was taken hostage, an independent basis to find the terrorism exception satisfied.  The Court agrees.

The FSIA incorporates the definition of "hostage taking" from Article I of the International Convention Against the Taking of Hostages, see 28 U.S.C. § 1605A(h)(2), which defines hostage taking as "seiz[ing] or detain[ing] and threaten[ing] to kill, to injure or to continue to detain another person . . . in order to compel a third party, namely, a State, . . . to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage," see International Convention Against the Taking of Hostages art. 1, Dec. 17, 1979, 1316 U.N.T.S. 205.  The definition "focuses

---

[9] The Court would reach the same result even if it concluded that Fakhoury's statements to his family members are admissible under the residual exception to hearsay found at Federal Rule of Evidence 807.  Under that "extremely narrow" and "sparingly" applied exception to the hearsay rule, hearsay may be admitted if it is both "very important and very reliable."  United States v. Mason, 951 F.3d 567, 574 (D.C. Cir. 2020) (quoting United States v. Slatten, 865 F.3d 767, 807 (D.C. Cir. 2017) (per curiam)); see Fed. R. Evid. 807 (allowing hearsay if the statement "is supported by sufficient guarantees of trustworthiness" and "is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts").  One judge in this District has invoked this exception to admit hearsay evidence of torture in a FSIA case, but the hearsay there was particularly reliable because the witness had himself experienced and witnessed similar treatment by the same captors.  See Sotloff v. Syrian Arab Republic, 525 F. Supp. 3d 121, 132 n.11 (D.D.C. 2021).  Here, the Fakhoury family has no similar firsthand knowledge; they are simply repeating what Fakhoury allegedly told them.  Regardless, admission of Fakhoury's statements would not help the plaintiffs, as the severity requirement would still be lacking.

on the intended purpose of the detention," <u>Price</u>, 294 F.3d at 94, with the "essential element" being

that of "third-party compulsion," <u>Radmanesh</u>, 6 F.4th at 1342 (cleaned up).

There is no question that Fakhoury was detained within the statute's meaning, as he was

"physical[ly] capture[d] and confine[d]," <u>Mohammadi</u>, 782 F.3d at 16—at least while still in the

military prison and military hospital.  The harder question is whether his captors detained him with

the requisite intent—that is, whether they sought to compel a third party to act as they wished "as

an explicit or implicit condition" of Fakhoury's release.

On this score, the plaintiffs point to the early release of an Iranian prisoner, Qassem

Tajeddine, from United States custody a couple months after Fakhoury's release from Lebanon.

Tajeddine's release, plaintiffs' expert Hanin Ghaddar says, was "supposedly for health reasons"

but in reality was part of a "prisoner swap deal between Washington and Tehran."  Ghaddar Decl.

¶ 40.  To reach this conclusion, Ghaddar relied on Lebanese news reports, the timing of Tajeddine's

release, knowledge of the Tajeddine case from reporting on it, and Iran's and Hezbollah's common

strategy of "[h]ostage taking and exchange . . . to free Iranian detainees from the US or [to]

strengthen the Iranian stance during negotiations."  <u>See</u> <u>id.</u> ¶¶ 4, 9, 39–40; <u>see also</u> Clawson Decl.

¶ 40.

Because Ghaddar relies heavily on Lebanese news reports, her conclusion on this topic

walks the line between a proper expert opinion that "relie[s] upon otherwise inadmissible sources

of information" and an improper expert opinion that merely serves "as a conduit for introducing

hearsay." <u>Owens</u>, 864 F.3d at 789.  But the unique FSIA terrorism context allows "greater leeway

for an expert witness . . . to rely on hearsay evidence in formulating his or her" opinion. <u>Flanagan</u>

<u>v. Islamic Republic of Iran</u>, 190 F. Supp. 3d 138, 175 (D.D.C. 2016).   In this more flexible

evidentiary environment—and with the important note that Tajeddine's release need not <u>actually</u>

have resulted from a quid pro quo so long as Hezbollah intended to extract such a quid pro quo, Simpson v. Socialist People's Libyan Arab Jamahiriya, 470 F.3d 356, 360 (D.C. Cir. 2006) ("Simpson II")—the expert's "uncontroverted" opinion is enough to clear this jurisdictional hurdle.  See Radmanesh, 6 F.4th at 1340; see also Simpson II, 470 F.3d at 362 (relying on expert opinion about intended purpose of detention was reasonable because plaintiffs "could not compel [the defendant state] to explain"); Fritz, 320 F. Supp. 3d at 57.

The Court acknowledges that there exist alternative, more innocent explanations for Fakhoury's detention.   On the plaintiffs' theory, Fakhoury's detention resulted from "a collaboration between Hezbollah and [Lebanese] state institutions, mainly the Lebanese General Security and the Army Intelligence."  Ghaddar Decl. ¶ 3.  That unusual causal chain—implicating not only a state sponsor of terrorism (Iran) and a terrorist group (Hezbollah) but also a state that is not a sponsor of terrorism (Lebanon)—gives the Court pause, as the Court is reluctant to ascribe nefarious activities to Lebanese institutions.   Furthermore, the record, despite its one-sided creation, suggests alternative possible motivations for Fakhoury's detention, including his past employment at a prison notorious for torturing Lebanese inmates and the criminal charges pending against him in Lebanon until 2018.[10]  See Ghaddar Decl. ¶¶ 4, 23.  Nonetheless, it is in the nature of default judgment cases under the FSIA that something less than certainty suffices to establish jurisdiction.  See Sotloff v. Syrian Arab Republic, 525 F. Supp. 3d 121, 134 (D.D.C. 2021).  In the absence of "any evidence in rebuttal," "the only question before this court is whether the plaintiffs have met their rather modest burden of production to establish" that Fakhoury was taken hostage with the intention of compelling third-party action.  Owens, 864 F.3d at 784.  They have done so.

---

[10] This observation is not meant to lend credence to allegations that Fakhoury participated in past torture; nothing before the Court suggests that is so.  It is only meant to acknowledge that Lebanon may have had other conceivable reasons to want Fakhoury detained.

### C.     Iran materially supported Hezbollah.

Next, the Court must determine whether Fakhoury's being taken hostage can be attributed to Iran.  It can be.

The FSIA provides two pathways to attribute terrorist activity to a state sponsor of terrorism: the state's "official[s], employee[s], or agent[s]," "acting within the scope of [their] office, employment or agency," must either commit the act of terrorism or provide "material support or resources for" and thereby "cause" the act.  28 U.S.C. § 1605A(a)(1).

The plaintiffs here invoke mainly the second pathway: they say that Iranian officials, acting in their official capacities, materially supported Hezbollah by granting it extensive financial and military support that proximately caused Fakhoury's detention.  Mot. at 14–16.  To make this showing, the plaintiffs must demonstrate that Iran's support for Hezbollah was a "substantial factor" in Fakhoury's being taken hostage, and that his hostage-taking was "reasonably foreseeable or anticipated as a natural consequence" of the support.  Owens, 864 F.3d at 794.  This standard does not require that Iran intended its support to result in Fakhoury's detention, or even that Iran knew of Fakhoury's existence.  See id. at 798–99.  Instead, if it was reasonably foreseeable that Hezbollah would take hostages utilizing Iran's support, the proximate causation condition is satisfied.  See id.  Under the statute, "material support or resources" can take the form of, among other things, "currency," "training," or "weapons."  See 28 U.S.C. § 1605A(h)(3); 18 U.S.C. § 2339A(b)(1).

The plaintiffs have provided plenty of evidence to link Iranian support to Hezbollah's actions on this theory.  According to their experts, "Iran created Hezbollah in 1982 to serve its purposes" and has sustained Hezbollah's existence ever since with yearly contributions of hundreds of millions of dollars.  Clawson Decl. ¶¶ 20, 42–58; Decl. of Prof. Barry Rubin in Kaplan

v. Hezbollah, Civ. A. No. 09-646 (RCL) (D.D.C. Sept. 12, 2011) [ECF No. 38-1] ("Rubin Decl.")

¶ 52 (Hezbollah "was established under Iranian auspices"). "Iran maintains" Hezbollah, these

experts have testified, "financially and through training and the provision of arms." Rubin Decl.

¶ 52; see also id. ¶ 25 (Hezbollah is "[e]quipped and trained by Iran"); Clawson Decl. ¶ 66 ("It is

my expert opinion that Iran . . . provided support for Hezbollah in the form of training, equipment,

and infrastructure."). And to this day, Hezbollah remains "dependent . . . on Iranian financial

assistance" to fund its activities, many of which are done at Iran's direction. Clawson Decl. ¶ 50,

58. Indeed, the plaintiffs refer the Court to testimony in past cases in which experts variously

described Hezbollah as "an arm of Iran," "a project of Iran," "Iran's key proxy for supporting

terrorism," and "Iran's most important regional terrorist client." Testimony of Prof. Guy Podoler

in Kaplan v. Hezbollah, Civ. A. No. 09-646 (RCL) (D.D.C. May 27, 2014) [ECF No. 38-3] at

14:24, 29:17; Rubin Decl. ¶ 32.

The Court concludes that this support was a substantial factor in Fakhoury's treatment, and

that Fakhoury's treatment was a reasonably foreseeable result of it. See Owens, 864 F.3d at 794.

Iran's support—which, according to the plaintiffs' experts, literally sustains Hezbollah's

existence—significantly "enhance[d]" Hezbollah's ability to take and hold hostages, meaning that

it was a substantial factor even if its support "is not directly traceable to" Fakhoury's detention.

Cabrera, 2022 WL 2817730, at *39. And the experts explain that Hezbollah regularly takes

Americans hostage as part of its terrorist activities, see Ghaddar Decl. ¶¶ 4, 9, 39–40; Clawson

Decl. ¶ 40, meaning that this act was reasonably foreseeable. Indeed, there is evidence in the

record that Hezbollah often acts directly at Iran's instruction—not an allegation made here with

regard to Fakhoury, but indicative of the group's close relationship with Iran. See Clawson Decl.

¶ 47.

Finally, the record leaves little doubt that Iran's support for Hezbollah was granted by Iranian officials or agents acting within the scope of their "office, employment, or agency." 28 U.S.C. § 1605A(a)(1). Per one of plaintiffs' experts, Iran's support for Hezbollah comes at the direction of institutions established within Iran's "formal government structure" and headed by its Supreme Leader. Clawson Decl. ¶¶ 29, 36, 67.

The Court therefore finds that Iran materially supported Hezbollah within the meaning of the FSIA—a finding that aligns with many courts' findings in past cases, see, e.g., Cabrera, 2022 WL 2817730, at *36 (finding that "Iran supports terrorist groups throughout the Middle East, including Hezbollah in Lebanon"); Murphy v. Islamic Republic of Iran, 740 F. Supp. 2d 51, 59–61 (D.D.C. 2010).

Because of this material support, whatever Hezbollah did to Fakhoury, the FSIA attributes to Iran. What's harder to discern is what exactly Hezbollah did to Fakhoury. The difficulty comes from the observation that this case involves Lebanese state institutions in addition to Hezbollah. The plaintiffs do not claim that Lebanon and Hezbollah are one and the same, so the Court cannot necessarily attribute all of Fakhoury's treatment to Hezbollah. Still, the plaintiffs do provide uncontroverted evidence that Hezbollah has infiltrated portions of the Lebanese government, and especially those portions responsible for Fakhoury's detention: the Lebanese General Security and Army Intelligence. Ghaddar Decl. ¶ 3. For instance, Ghaddar explains that Hezbollah engaged in a "persistent and longstanding strategy to infiltrate Lebanese state institutions," a strategy that achieved its greatest successes between 2018 and 2022—a period encompassing Fakhoury's detention. Id. ¶ 30. And that success was concentrated in the "two institutions that arrested and held" Fakhoury—the security and military apparatuses—where, according to the expert, "decision making, high posts, and leadership [were] heavily infiltrated by Hezbollah and Iran." Id. ¶ 37.

Finally, the expert also relied on a public statement allegedly made by the judge who ordered Fakhoury's arrest and detention, in which the judge stated that Fakhoury's detention was "baseless and at the whim of . . . Hezbollah . . . solely to advance its nefarious political purposes." Id. ¶ 38.[11] On the basis of expert testimony that Hezbollah exercised significant control over the Lebanese agencies that held Fakhoury hostage, coupled with the judge's statement about the forces behind Fakhoury's detention, the Court accepts Ghaddar's opinion that "Fakhoury's apprehension . . . in Lebanon was ordered and executed by Hezbollah." Ghaddar Decl. ¶ 3.

Accordingly, the Court concludes that the plaintiffs have provided satisfactory evidence that Hezbollah leveraged power in the Lebanese government to take Fakhoury hostage in furtherance of its and Iran's ends. And because it did so with the material aid of Iran, its acts can be attributed to Iran.

### D.    Iran's actions did not cause Fakhoury's death but did cause personal injury.

One last thread remains to be sewn in the jurisdictional quilt. Because the FSIA abrogates sovereign immunity "for personal injury or death . . . that was caused by" (as relevant here) hostage taking, Iran loses its sovereign immunity only if the acts at issue proximately caused personal injury or death. 28 U.S.C. § 1605A(a)(1) (emphasis added); see Borochov, 94 F.4th at 1062; Kilburn, 376 F.3d at 1127 ("causation is . . . a jurisdictional requirement"). The plaintiffs style their action mainly as one for "wrongful death," Compl. ¶ 1, but, as explained below, offer no reliable evidence tying Fakhoury's death to his being taken hostage. Still, the Court can discern from the record enough causation of personal injury to sustain jurisdiction.

---

[11] This statement, like Lebanese reporting of the reasons for Tajeddine's release, is itself hearsay—but the expert was not forbidden from considering it when forming her opinion on Hezbollah's influence over Fakhoury's detention. Flanagan, 190 F. Supp. 3d at 174–75.

The causation requirement here is the same as that above: the plaintiffs must show (1) Iran's actions were "a substantial factor" in the sequence of events that led to Fakhoury's injury; and (2) the injury was "reasonably foreseeable or anticipated as a natural consequence" of Iran's actions. Owens, 864 F.3d at 794. But whereas the plaintiffs drew a line from Iran's support to Fakhoury's detention, they have not done the same from Fakhoury's detention to his death: the record contains almost nothing about the health-related consequences of Fakhoury's detention. Recall that Fakhoury died of cancer, not violence.[12] So to attribute Fakhoury's death to his time as a hostage, the plaintiffs must show that something about the conditions of his confinement— e.g., a delay in treatment or the severity of the conditions he experienced while confined—either caused the cancer or increased the chance that he would succumb to it. But the only record evidence for either proposition comes from two paragraphs in a declaration by one of Fakhoury's daughters:

> As a scientist who specializes in cancer research, I can attest to the fact that Epstein-Barr Virus is a gene mutation and can be transferred by filthy conditions, sperm, and saliva. My father contracted Epstein-Barr virus due to the filthy conditions in the Lebanese prison. If my father's initial stomach pain complaints had been addressed with a medical evaluation and proper medical treatment, the Epstein-Barr virus could have been treated and cured. My father endured six months of unlawful imprisonment without proper medical treatment. His untreated lymphoma greatly accelerated during his time in prison. . . . His doctor [in the United States] indicated that the cancer was aggressive and had already spread throughout my father's body and that his chances of successful cancer treatment at that late stage were very slim. Having studied lymphoma as part of my research, I was shocked at how poor my father's odds were. Lymphoma is known as one of the most treatable cancers and I knew that if he had only received the necessary care he needed in Lebanon he would still be alive today.

---

[12] It is not even clear that the record contains competent evidence that Fakhoury's death resulted from cancer. It is devoid of medical records, doctor's notes, or anything besides statements by Fakhoury's family members relaying what doctors told them about Fakhoury's condition. See, e.g., Guila Decl. ¶ 20 ("[M]y father was evaluated by one of the top cancer specialists in the world at Dana Farber Cancer Institute. He now had stage IV Epstein Barr-virus lymphoma."); Elias Decl. ¶ 33 ("When we returned to the U.S., the very next day Amer was evaluated at one of the best cancer centers in the area, Dana Farber, and he was told he had stage IV lymphoma."). Still, the Court assumes for purposes of this opinion that Fakhoury died of cancer.

Guila Decl. ¶¶ 19–20.[13]  With due respect to Guila Fakhoury's scientific expertise—which this Court has no reason to doubt—the plaintiffs do not attempt to qualify her as an expert or provide evidence of her training to make these conclusions about her father's health.  So the Court is compelled to treat this statement as nothing more than the unsupported assertion of an untrained plaintiff opining on the cause of death of her own father.  That is not nearly enough evidence to pin Fakhoury's death to any delay in medical attention that may have resulted from his time in Lebanese custody.

Fakhoury's death was tragic and his treatment in Lebanon poor.  But the plaintiffs offer nothing to connect the one to the other.  And, unlike attempts to discern what happened to Fakhoury in a foreign state's military prison, attempting to discern the health-related consequences of a delay in treatment does not benefit from the FSIA's evidentiary flexibility.  The former context warranted flexibility because the FSIA accounts for practical limitations in gathering evidence of a hostile state's intentions and behavior behind closed doors.  See Han Kim, 774 F.3d at 1048.  No such limitations justify similar grace here, where "we could realistically expect more" from the plaintiffs.  Id. at 1047.  Fakhoury received extensive medical treatment in the United States, and there is no reason the plaintiffs could not have presented the Court with reliable evidence of the health-related consequences of his detention and any attendant delay in treatment.  Because they did not, the Court has no basis on which to attribute Fakhoury's death to his treatment in Lebanon.

But the plaintiffs nonetheless prevail to some extent, because the FSIA grants jurisdiction not only over wrongful death claims but also over personal injury claims.  28 U.S.C. § 1605A(a)(1).  The record leaves little question that Fakhoury suffered personal injury as a

---

[13] See also Guila Decl. ¶ 25 ("Had my father's complaints of stomach pains, weight loss and sweats been medically evaluated, the Epstein-Barr virus diagnosis would have been made timely and antiviral medication could have been attempted to treat the Epstein-Barr virus and it might not have become lymphoma.  And had the lymphoma been diagnosed timely my father could have been treated for lymphoma, which is a very treatable form of cancer.").

proximate result of his detention.  At the very least, the incarceration caused Fakhoury severe mental distress, as his family members describe witnessing symptoms of post-traumatic stress upon his return to the United States.  Elias, for instance, explains that Fakhoury returned "a broken man" who "would wake up frequently at night due to nightmares."  Elias Decl. ¶ 35; see also Guila Decl.  ¶ 22.  Fakhoury's family, too, plainly suffered emotional distress, and a psychiatric evaluation of each plaintiff supports the serious emotional toll the ordeal took on the family.  See generally Decl. of Dr. Rael Strous [ECF No. 32].  Personal injuries under the FSIA need not be physical, so this distress—even setting aside the possibility that other physical consequences Fakhoury suffered besides his death can be attributed to his incarceration—supports jurisdiction. See Ewan v. Islamic Republic of Iran, 466 F. Supp. 3d 236, 245–46 (D.D.C. 2020) (assuming jurisdiction over claims for emotional distress brought by individuals near bombings).[14]

## II.    Liability and damages

"Having concluded that the Court possesses subject matter jurisdiction, little else is required to show that Plaintiffs are entitled to relief under" 28 U.S.C. § 1605A(c) because "[t]here is almost total overlap between" the two analyses.  Fritz, 320 F. Supp. 3d at 86 (citation omitted). The same cannot be said for calculating damages: there, much else is required.  The Court has sustained jurisdiction in a significantly narrower way than the plaintiffs propose.  As a result, it is difficult to discern from the existing briefing what damages should be awarded.  The plaintiffs are therefore instructed to file supplemental briefing explaining the damages they believe resulted

---

[14] To perfect jurisdiction, this Court must have not only subject matter but also personal jurisdiction over Iran.  GSS Grp. v. Nat'l Port Auth., 680 F.3d 805, 811 (D.C. Cir. 2012).  "[U]nder the FSIA, 'subject matter jurisdiction plus service of process equals personal jurisdiction.'"  Id. (quoting Price, 294 F.3d at 95); see 28 U.S.C. § 1330(b). After attempting preferred methods of service under 28 U.S.C. § 1608(a), the plaintiffs successfully served Iran through the diplomatic process, meaning the Court has both personal and subject matter jurisdiction.  Cabrera v. Islamic Republic of Iran, Civ. A. No. 18-2065 (JDB), 2024 WL 4345784, at *1 n.2 (D.D.C. Sept. 30, 2024); see Aff. Requesting Foreign Mailing [ECF No. 4]; Certificate of Mailing [ECF No. 5]; Service Letter; Aff. in Supp. of Default [ECF No. 25]; Default [ECF No. 26].

from Fakhoury's being taken hostage—but not from his purported torture—and from his personal injury—but not his death.  In doing so, they are also instructed to explain for what portion of his time in Lebanon they assert that Fakhoury was held hostage within the meaning of the FSIA.

### Conclusion

For the above reasons, the Court will grant the plaintiffs' motion for default judgment and order further briefing on damages.  A separate order will issue.

_____/s/_____

JOHN D. BATES
United States District Judge

Dated: <u>November 13, 2024</u>