**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**ESTATE OF AMER FAKHOURY et al.,**

    **Plaintiffs,**

        **v.**

**ISLAMIC REPUBLIC OF IRAN,**

    **Defendant.**

**Civil Action No. 21-1218 (JDB)**

---

## MEMORANDUM OPINION

The estate and family of Amer Fakhoury sued the Islamic Republic of Iran for materially supporting Hezbollah, which allegedly took Fakhoury hostage and tortured him. The Court granted in part the plaintiffs' motion for default judgment—concluding that Fakhoury had been taken hostage but not tortured—and ordered supplemental briefing on damages, to which the Court now turns.

### Background

An earlier memorandum opinion details this case fully. See Estate of Fakhoury v. Islamic Republic of Iran, Civ. A. No. 21-1218 (JDB), 2024 WL 4771467 (D.D.C. Nov. 13, 2024). The Court here recounts only what is necessary for the damages issue at hand.

Amer Fakhoury and his family traveled from the United States to Lebanon in September 2019. Id. at *1. The trip did not go as planned. At the behest of Hezbollah (acting with Iran's material support), Fakhoury was detained in Lebanese prisons from September 12 to mid-December 2019, and then not permitted to leave the country until March 2020. Id. at *2–3; Decl. of Micheline Elias [ECF No. 33] ("Elias Decl.") ¶ 28. Meanwhile, Fakhoury's health deteriorated.

Fakhoury and his wife, Micheline Elias—who remained in Lebanon to support him and advocate for his release—sought treatment at various private hospitals between mid-December 2019 and March 2020.  Fakhoury, 2024 WL 4771467, at *3.  Fakhoury eventually passed away from cancer in August 2020, five months after arriving back home.  Id.

In addition to the obvious suffering this ordeal caused Fakhoury, it caused a great deal of stress for his family, as well.  Most obviously, it was difficult for Elias, who remained in Lebanon at personal risk and watched as Fakhoury's health deteriorated.  Id. at *2.  And the couple's four children suffered, too, though they worried from afar in the United States.  For instance, Guila Fakhoury attests to the "constant stress" of worrying about and advocating for her father, and of receiving "real time" updates from Elias about Fakhoury's health.  Decl. of Guila Fakhoury [ECF No. 34] ("Guila Decl.") ¶¶ 13–14.  Amanda Fakhoury describes her "constant state of anxiety and fear."  Decl. of Amanda Fakhoury [ECF No. 35] ("Amanda Decl.") ¶ 7.  Macy Fakhoury explains that her life during Fakhoury's detention "revolved around securing [Fakhoury's] release and return to the United States," which was "extremely traumatic.  Decl. of Macy Fakhoury [ECF No. 36] ("Macy Decl.") ¶ 14.  And Zoya Fakhoury describes how her family's life "completely transformed" during Fakhoury's detention, causing her constant anxiety and difficulty sleeping.  Decl. of Zoya Fakhoury [ECF No. 37] ("Zoya Decl.") ¶¶ 9–10.

The Fakhourys—Amer Fakhoury's estate, wife, and four children—sued Iran under the Foreign Sovereign Immunities Act ("FSIA").  See Compl. [ECF No. 1].  They moved for default judgment after Iran failed to appear, invoking the FSIA's terrorism exception to the country's sovereign immunity on the grounds that Hezbollah, acting with Iran's material support, had taken Fakhoury hostage and tortured him.  Fakhoury, 2024 WL 4771467, at *3–4.

The Court granted the motion for default judgment, but on significantly narrower grounds than the plaintiffs had proposed. The Court exercised jurisdiction and held that Iran was liable because the plaintiffs had shown by "evidence satisfactory to the court" that Hezbollah had indeed taken Fakhoury hostage. Id. at *4, *10; see 28 U.S.C. § 1608(e). It did not reach the same conclusion, however, as to two other core arguments the plaintiffs raised. For one, the plaintiffs had not shown that Fakhoury had been tortured within the FSIA's meaning. Fakhoury, 2024 WL 4771467, at *5. For another, the plaintiffs had not tied Fakhoury's death—tragic as it was—to his treatment in Lebanon. Id. at *10–11. But because they had shown that Fakhoury's time as a hostage had inflicted a "serious emotional toll" on him and his family, they were entitled to a default judgment. Id. at *11.

The variances from the case as originally presented made assessing damages difficult. Both as to Fakhoury's estate and as to his family members, the requested damages relied in large part on the assumption that Fakhoury had lost his life to his mistreatment in Lebanon. See, e.g., Proposed Findings of Fact & Conclusions of Law [ECF No. 42] at 1, 59 (positing that Fakhoury's treatment in Lebanon "result[ed] in his death" and requesting $8 million for Elias because Fakhoury "was the glue of their family and his painful death destroyed their family for the worse with long lasting effects"); Mot. for Default J. [ECF No. 41] at 26. With that assumption kneecapped, the existing briefing on damages was unhelpful.

So the Court ordered supplemental briefing on the damages the plaintiffs "believe resulted from Fakhoury's being taken hostage—but not from his purported torture—and from his personal injury—but not his death." Fakhoury, 2024 WL 4771467, at *11. And the Court further instructed the plaintiffs to "explain for what portion of his time in Lebanon they assert that Fakhoury was held hostage within the meaning of the FSIA." Id. The Court has reviewed the plaintiffs'

supplemental brief on damages, see Suppl. Mem. of L. on Damages [ECF No. 48] ("Suppl. Br."), and will now award damages in the following amounts: $1.5 million to the estate of Amer Fakhoury; $1 million to Micheline Elias; $750,000 to each of the couple's four children; and $5.5 million in punitive damages.  Accounting for prejudgment interest, the total awards come to $2.1135 million to Fakhoury's estate; $1.409 million to Micheline Elias; $1,056,750 to each child; and $7,749,500 in punitive damages.

## Analysis

Damages available under the FSIA "include economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c).  Of these, the plaintiffs pursue the latter three.  Fakhoury's estate requests pain and suffering damages for his time as a hostage and the ensuing trauma, and the family-member plaintiffs request solatium damages for the emotional suffering they experienced from Fakhoury's detention and its aftermath.  All request punitive damages.

The Court will award damages for consequences that were "reasonably certain" to result from Iran's wrongful conduct in the amount the plaintiffs have "proven by a reasonable estimate." Fraenkel v. Islamic Republic of Iran, 892 F.3d 348, 353 (D.C. Cir. 2018) (cleaned up).  Damage awards in these cases are both inherently unsatisfying—because money can never replace what was taken—and imperfect—because neither physical nor emotional pain and suffering is easily quantified.  See, e.g., Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 32 (D.D.C. 1998); Moradi v. Islamic Republic of Iran, 77 F. Supp. 3d 57, 70 (D.D.C. 2015).  That is especially true here, since Fakhoury is deceased and cannot attest to his pain and suffering.  With perfect accuracy out of reach, courts turn to consistency: "[A] court's 'primary consideration is to ensure that individuals with similar injuries receive similar awards.'"  Cabrera v. Islamic Republic of Iran

("<u>Cabrera I</u>"), Civ. A. No. 19-3835 (JDB), 2022 WL 2817730, at *43 (D.D.C. July 19, 2022) (quoting <u>Moradi</u>, 77 F. Supp. 3d at 70). The Court endeavors to do that here.

## I.    Pain and Suffering Damages to Fakhoury's Estate

Fakhoury's estate seeks pain and suffering damages to compensate for the suffering Fakhoury experienced as a hostage and in the few months he lived after his release. As the plaintiffs recognize, courts have sought to bring consistency to this subjective endeavor by establishing a baseline award for time as a hostage of $10,000 per day. <u>See, e.g.</u>, <u>Rezaian v. Islamic Republic of Iran</u>, 422 F. Supp. 3d 164, 180 (D.D.C. 2019) (noting the consistent practice of courts in this district to "set damages for prolonged and abusive captivity" as a hostage "at $10,000 per day for the pain and suffering that victims experienced while imprisoned"); <u>see also</u> <u>id.</u> at 180 n.4 (collecting cases). So the Court must know just how long Fakhoury was a hostage—hence its direction that the plaintiffs should explain "for what portion of his time in Lebanon they assert that Fakhoury was held hostage within the meaning of the FSIA." <u>Fakhoury</u>, 2024 WL 4771467, at *11. Regrettably, the supplemental brief does not engage on this topic. Instead, it asserts without explanation that Fakhoury was held hostage from September 12, 2019 to March 19, 2020, or 189 days. <u>See</u> Suppl. Br. at 1.

The issue is not as straightforward as it may seem. The plaintiffs' assumption—that Fakhoury was a hostage for his whole post-abduction stay in Lebanon, from September 2019 to March 2020—has some intuitive appeal because, as the Court explained in its earlier opinion, Fakhoury was apparently "not permitted to leave Lebanon" until he did in March. <u>Fakhoury</u>, 2024 WL 4771467, at *3 n.4. But imposing "a prohibition on international travel" is not hostage taking. <u>Mohammadi v. Islamic Republic of Iran</u>, 782 F.3d 9, 16 (D.C. Cir. 2015). Only "physical capture and confinement" is. <u>Id.</u>; <u>see also</u> <u>Radmanesh v. Islamic Republic of Iran</u>, 6 F.4th 1338, 1342

(D.C. Cir. 2021).  As far as the Court can discern from the record, Fakhoury "had relative autonomy over where [he] sought treatment within Lebanon" once he was discharged from the military hospital and allowed to seek treatment at private hospitals.  <u>Fakhoury</u>, 2024 WL 4771467, at *3 & n.4; <u>see</u> Elias Decl. ¶¶ 27–28.[1]  That evidently happened in mid-December 2019.  Elias Decl. ¶ 28.

So, without argument to the contrary from the plaintiffs, the Court concludes that Fakhoury's time as a hostage lasted approximately 100 days, from September 12 to mid-December 2019.  Applying the $10,000-per-day default results in a $1,000,000 award for Fakhoury's pain and suffering during his captivity.

Some courts have concluded that in "extreme circumstances of hostage-taking" the $10,000 per diem amount "fails to account" for the full load of pain and suffering.  <u>Stansell v. Republic of Cuba</u>, 217 F. Supp. 3d 320, 346 (D.D.C. 2016).  The plaintiffs rightly do not contend this is such a case.  Though the Court does not wish to diminish the suffering Fakhoury surely experienced, the evidence in this case does not establish treatment like that held to justify supplemental lump-sum payments.  Indeed, some courts have stuck to the per diem amount even where they found that the hostage had been tortured while detained—a finding this Court has not made here.  <u>See, e.g.</u>, <u>Hekmati v. Islamic Republic of Iran</u>, 278 F. Supp. 3d 145, 161, 164 (D.D.C. 2017) ("see[ing] no reason to deviate" from the $10,000 per diem even though the plaintiff had been tortured while in custody); <u>Rezaian</u>, 422 F. Supp. 3d at 180 (same).  And hostages are not

---

[1] In fact, it is not clear that Fakhoury was a hostage even when he was in the military hospital.  According to Elias, Fakhoury told her that "a random man with a gun" had come to visit him in the military hospital, and Fakhoury feared "that this man was from Hezbollah and attempting to gather information about where he was so they could kill him."  Elias Decl. ¶¶ 23–24.  If indeed Fakhoury remained a hostage of Hezbollah at the time, this fear would make no sense; it would be odd, to say the least, for Hezbollah not to know where its hostages are.  But this one-off, hearsay-based comment does not cause the Court to shorten further Fakhoury's time as a hostage.  Elias describes the military hospital as essentially "a prison facility with guards," the military is part of the Lebanese security apparatus that detained Fakhoury, and it does not appear that Fakhoury was able to leave.  <u>See id.</u> ¶ 23.  The Court therefore counts Fakhoury's time in the military hospital as time he was a hostage.  <u>Cf.</u> <u>Kar v. Islamic Republic of Iran</u>, Civ. A. No. 19-2070 (JDB), 2022 WL 4598671, at *8 (D.D.C. Sept. 30, 2022) (victim "chained and watched by guards" in a hospital remained a hostage).

frequently housed in friendly conditions, so the $10,000 baseline already assumes "abusive captivity" akin to the inhospitable lodgings in which Fakhoury was detained. Hekmati, 278 F. Supp. 3d at 163; see also Kilburn v. Islamic Republic of Iran, 699 F. Supp. 2d 136, 156 (D.D.C. 2010) ("The $10,000 per day figure is meant to compensate a former hostage for their intense suffering, including, inter alia, loneliness, beatings, and a lack of hygiene."). The per diem baseline is appropriate here.

Although they accept the baseline, the plaintiffs ask the Court to adjust it to account for inflation. They point out that the $10,000-per-day figure dates back to a case decided in 2000 and ask the Court to award Fakhoury's estate an equivalent daily amount in today's terms, which they peg at $18,690.34 per day. See Suppl. Br. at 5. But the plaintiffs point to no precedent for this approach, and the Court has found none. To the contrary, courts consistently adhere to the $10,000 per day award even as inflation continues to climb. See, e.g., Wang v. Islamic Republic of Iran, Civ. A. No. 22-583 (TJK), 2025 WL 785736, at *13 (D.D.C. Mar. 12, 2025); Rezaian, 422 F. Supp. 3d at 180. In the interest of consistency, this Court will do the same.[2]

The plaintiffs rightly point out, however, that Fakhoury's pain and suffering did not end upon his release. Fakhoury continued to suffer from the psychological wounds of his captivity until he passed away on August 17, 2020—eight months after his release to a private hospital in Lebanon and five months after returning to the United States. See Fakhoury, 2024 WL 4771467, at *3. According to Elias, Fakhoury returned "a shell of his former self." Elias Decl. ¶ 35. "He

---

[2] Despite recognizing the appropriateness of the default per diem award, the plaintiffs' supplemental brief on damages manages to propose an award of $6,959,455.58 for Fakhoury's estate. See Suppl. Br. at 6. This is remarkable, as it is more than the $6.9 million award for Fakhoury's estate the plaintiffs originally requested—before the Court rejected a number of their claims. See Proposed Findings of Fact & Conclusions of Law at 62. It is even more remarkable given that the plaintiffs appear to think that the Court's refusal to find that Fakhoury was tortured or that his death was caused by the treatment at issue in this case affected only the estate's damages, and not the family members'. See Suppl. Br. at 1 n.1. Surely the narrowing of the plaintiffs' claims had some effect; there is no plausible case that it increased Fakhoury's estate's damages and left the family members' damages untouched.

would wake up frequently at night due to nightmares and he often had flashbacks of the guards in the prison waking him up in the middle of [the] night threatening his life with their guns." Id.; see also Guila Decl. ¶¶ 21–23 (Fakhoury "was never the same" upon his return; he "would often wake up in the middle of the night screaming" and "would burst into tears out of the blue").

Assessing an appropriate damages award for this post-captivity suffering is an imperfect art. It requires consideration of "the length of time" Fakhoury "experienc[ed] pain and suffering" after his release "and the extent of [his] long-term injuries." Rezaian, 422 F. Supp. 3d at 180 (quoting Hekmati v. Islamic Republic of Iran, 278 F. Supp. 3d 145, 164 (D.D.C. 2017)). As the plaintiffs recognize, Fakhoury's unfortunate passing means "his post-captivity pain and suffering is not exactly comparable to other cases where the victim lived with his trauma for many years." Suppl. Br. at 1–2; cf. Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 77 (D.D.C. 2010) (noting that there can be no pain and suffering damages for an instantaneous death); Cabrera v. Islamic Republic of Iran ("Cabrera III"), Civ. A. No. 19-3835 (JDB), 2023 WL 3496303, at *10 (May 16, 2023) (reducing awards for older family members who will have to "suffer with [the] loss" for less time). Still, eight months is a significant amount of time to battle the severe psychological effects Fakhoury experienced.

The Court concludes that an appropriate award for Fakhoury's post-captivity pain and suffering is $500,000. This award recognizes that Fakhoury's suffering continued—but diminished—after his release, and it also brings his estate's total award to $1.5 million, consistent with cases involving primarily emotional injury. See Barry v. Islamic Republic of Iran, 437 F. Supp. 3d 15, 57 (D.D.C. 2020) (collecting cases awarding $1.5 to $2.5 million for emotional injuries accompanied by no or minor physical injuries); Ewan v. Islamic Republic of Iran, 466 F. Supp. 3d 236, 248 (D.D.C. 2020); Allan v. Islamic Republic of Iran, Civ. A. No. 17-338 (RJL),

2019 WL 2185037, at *6 (May 21, 2019); Davis v. Islamic Republic of Iran, 882 F. Supp. 2d 7, 12 (D.D.C. 2012).

Of course, the plaintiffs present Fakhoury's injuries as emotional and physical. But, as the Court's earlier memorandum opinion explained, the Court has not received competent evidence of any significant physical injury beyond what might be expected from generally very poor conditions of incarceration. See Fakhoury, 2024 WL 4771467, at *6, *10–11; cf. Ewan, 466 F. Supp. 3d at 248 (awarding $1.5 million for emotional pain and suffering where "the record evidence of physical injury [was] too weak to justify an award above that normally provided to surviving victims suffering only psychological trauma"); Kilburn, 699 F. Supp. 2d at 156 (explaining that the per diem amount already presumes the physical discomfort that often accompanies being held hostage, including beatings). So the $1.5 million total award to the estate is appropriate and consistent with the compensation for similar injuries in other cases.

## II.    Solatium Damages for the Family-Member Plaintiffs

Fakhoury's wife and four children also request damages for their emotional distress. Such "solatium" damages seek to compensate for "the mental anguish, bereavement and grief that those with a close personal relationship" to the victim endure, as well as the loss of the victim's "society and comfort." Oveissi v. Islamic Republic of Iran, 768 F. Supp. 2d 16, 25 (D.D.C. 2011) (internal quotation marks omitted). To help guide the impossible task of quantifying emotional distress, judges in this District have established two primary frameworks, called the Peterson II[3] and Heiser[4] frameworks. Although these frameworks were "developed in the context of large-scale terrorist attacks, courts have also applied [them] in cases of hostage-taking." Amirentezam v.

---

[3] See Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25 (D.D.C. 2007).

[4] See Estate of Heiser v. Islamic Republic of Iran, 466 F. Supp. 2d 229 (D.D.C. 2006).

Islamic Republic of Iran, Civ. A. No. 19-2066 (GMH), 2023 WL 5724121, at *24 (D.D.C. Sept. 5, 2023) (quoting Moradi, 77 F. Supp. 3d at 72). "This Court has previously endorsed the Peterson II framework, and it will do so in this case," though they are not meaningfully different here: both frameworks prescribe a default award of $4 million for spouses and $2.5 million for children of victims injured but not killed by terrorist activity, including hostage-taking. Kar v. Islamic Republic of Iran, Civ. A. No. 19-2070 (JDB), 2022 WL 4598671, at *18–19 (D.D.C. Sept. 30, 2022) (cleaned up).

Where, as here, the victim suffered primarily emotional injury, the framework decreases the award for the victim and "scales . . . proportionately" the awards for his family members. Barry, 437 F. Supp. 3d at 58; see also Ewan, 466 F. Supp. 3d at 249. In such cases, courts have adopted default figures of $1.5 million for spouses and $1 million for children, or $1 million for spouses and $750,000 for children. Barry, 437 F. Supp. 3d at 58 ($1.5 million and $1 million); see, e.g., Maxwell v. Islamic Republic of Iran, Civ. A. No. 22-173 (RC), 2024 WL 1342775, at *19 (D.D.C. Mar. 29, 2024) (same); Kaplan v. Hezbollah, 213 F. Supp. 3d 27, 38 (D.D.C. 2016) ($1 million and $750,000); Davis, 882 F. Supp. 2d at 15–16 (same); Estate of Brown v. Islamic Republic of Iran, 872 F. Supp. 2d 37, 42 (D.D.C. 2012) (same). Scaling the figures in this way helps ensure that family members who experienced terrorism only vicariously do not receive more than "individuals directly injured." Sheikh v. Republic of Sudan, 485 F. Supp. 3d 255, 270 (D.D.C. 2020); Ewan, 466 F. Supp. 3d at 249; Davis, 882 F. Supp. 2d at 15. In light of the $1.5 million award to Fakhoury's estate, it is sensible to reduce the family members' baselines to $1 million for his spouse and $750,000 for each child, "in rough proportion" to the estate's award. See Sheikh, 485 F. Supp. 3d at 271 (internal quotation marks omitted).

The plaintiffs advocate both for a higher baseline and for an upward departure from it.  <u>See, e.g.</u>, Proposed Findings of Fact & Conclusions of Law at 59.  Neither is appropriate.  First, the plaintiffs believe the Court should apply the $8 million and $5 million baselines courts routinely award to spouses and children of victims killed in terrorist attacks.  <u>Id.</u>; <u>see also</u> <u>Kar</u>, 2022 WL 4598671, at *18.  But the plaintiffs have not shown that Iran caused Fakhoury's death, meaning he is not similarly situated to the victims in those cases.  <u>Cf.</u> <u>Kar</u>, 2022 WL 4598671, at *18 (family members of a victim who "died in Iran's custody" but "was not a victim of an extrajudicial killing" received a lower baseline); <u>Barry</u>, 437 F. Supp. 3d at 58.

Second, the plaintiffs believe the Court should deviate above the baseline amounts because the family was especially close and Fakhoury's forced absence therefore inflicted unusually severe distress.  <u>See</u> Proposed Findings of Fact & Conclusions of Law at 40.  There is no question that the family was close, nor that the ordeal impacted the Fakhourys deeply.  But the same is true of many families of terrorism victims, and the hefty baseline awards "presume[]" that family members "have close relationships" and therefore "endure[] significant emotional suffering" when their loved ones are targeted.  <u>Wang</u>, 2025 WL 785736, at *14.

If anything, this case presents the prospect of a downward departure.  While the treatment Fakhoury experienced was undoubtedly outrageous, it doesn't quite measure up to the "large-scale terrorist attacks" that inspired the <u>Peterson II</u> and <u>Heiser</u> frameworks.  <u>See</u> <u>Amirentezam</u>, 2023 WL 5724121, at *24.  Nonetheless, the Court will stick with the default amounts.  The estate's award was lowered in part by the relatively short time Fakhoury suffered between his release and his death—but Fakhoury's family members will live with the trauma for much longer.  <u>See, e.g.</u>, Dr. Rael Strous Eval. of Amanda Fakhoury [ECF No. 32-2] at 9 (opining that Amanda's "significant depression and grief" "will continue to affect her for a prolonged period of time"); Dr. Rael Strous

11

Eval. of Guila Fakhoury [ECF No. 32-3] at 11 (similar for Guila); Dr. Rael Strous Eval. of Macy Fakhoury [ECF No. 32-4] at 9 (similar for Macy); Dr. Rael Strous Eval. of Micheline Fakhoury [ECF No. 32-5] at 9 (similar for Elias);[5] Dr. Rael Strous Eval. of Zoya Fakhoury [ECF No. 32-6] ("Strous Zoya Eval.") at 8–9 (similar for Zoya).[6] And that suffering was more prolonged than the suffering that follows more instantaneous terrorist attacks; whereas the families of the victims of a single attack must "cope with the grief that follows the loss of a loved one," families of hostages are "at the time of the event . . . forced to endure unending anxiety and an extended period of extreme distress over the health and safety of their captive family member." Warmbier v. Democratic People's Republic of Korea, 356 F. Supp. 3d 30, 59 (D.D.C. 2018) (quoting Oveissi, 768 F. Supp. 2d at 27).

Accordingly, the Court will award $1 million to Micheline Elias and $750,000 each to Amanda, Guila, Macy, and Zoya Fakhoury.

### III.    Prejudgment Interest

The plaintiffs next request prejudgment interest on their compensatory damages. See Mot. for Default J. at 29. "Whether to award prejudgment interest 'is a question that rests within this Court's discretion, subject to equitable considerations.'" Cabrera I, 2022 WL 2817730, at *54 (quoting Oveissi, 879 F. Supp. 2d at 58). "This Court and several others in this District have previously awarded prejudgment interest on similarly situated plaintiffs' awards, including pain and suffering and solatium." Id. (quoting Ewan, 466 F. Supp. 3d at 250 (collecting cases). Although there is some disagreement about this practice, see id. (noting that some judges have

---

[5] Dr. Strous's evaluation of Micheline Elias refers to her as Micheline Fakhoury. The Court continues to refer to her as Micheline Elias, as the rest of the record does.

[6] The "prognosis" section of Dr. Strous's evaluation of Zoya Fakhoury refers to Zoya by her sister's name, Amanda. See Strous Zoya Eval. at 8. While this apparent copy-and-paste job does not inspire confidence about the individualized nature of the evaluations, it doesn't cause the Court to discard the general accuracy of Dr. Strous's findings and the Court sees no reason to doubt that Fakhoury's ordeal traumatized each of his children.

concluded that prejudgment interest should not be applied to damages awarded under the <u>Heiser</u> or <u>Peterson II</u> frameworks), "the Court concludes—as it has done in the past—that an award of prejudgment interest is appropriate," <u>id.</u> at *55 (citation omitted). "Awards for pain and suffering and solatium are calculated without reference to the time elapsed since the" relevant terrorist activity. <u>Ewan</u>, 466 F. Supp. 3d at 250 (citation omitted). "A solatium award is therefore best viewed as fixed at the time of the" activity, <u>id.</u> (citation omitted), and failing to award plaintiffs prejudgment interest would permit Iran to profit from the use of the money in the meantime, <u>id.</u>[7]

<u>Forman v. Korean Air Lines Co.</u>, 84 F.3d 446 (D.C. Cir. 1996), guides the Court's calculation of prejudgment interest. So the Court uses the prime rate rather than the Treasury Bill rate. <u>See Cabrera I</u>, 2022 WL 2817730, at *55 (explaining how the former rate is a "market-based estimate of what a victim would have had to pay to borrow money at the time of the relevant attack" (internal quotation marks omitted)). As it has done previously, <u>e.g.</u>, <u>id.</u> at *55–56; <u>Ewan</u>, 466 F. Supp. 3d at 250–51, the Court will use the Federal Reserve's data for the average annual prime rate in each year from the date when Fakhoury's detention began—September 12, 2019— through 2025, <u>see Cabrera I</u>, 2022 WL 2817730, at *55.[8] To determine the prime rate, the Court first uses the Federal Reserve's data to find the average annual prime rate from 2019 through 2025. <u>Id.</u> Then, the Court uses the prime rates from the relevant year and discounts for the percentage

_____

[7] The plaintiffs indicate that they may seek to recover a portion of their damages from the United States Victim of State Sponsored Terrorism Fund. <u>See</u> Status Report [ECF No. 49]. The Fund "does not allow for recovery of prejudgment interest" or punitive damages. <u>Cabrera I</u>, 2022 WL 2817730, at *55 n.44. The Court will adhere to its practice and award both prejudgment interest and punitive damages even if those awards end up being "largely symbolic" because the awards are necessary "to compensate the plaintiffs for the injuries they have suffered and to ensure that Iran faces appropriate consequences for its support of terrorist attacks on American victims." <u>Id.</u>

[8] Though it is not entirely clear whether prejudgment interest should begin to accrue upon Fakhoury's capture, his release, or some other date, <u>see</u> <u>Gidada v. Islamic Republic of Iran</u>, Civ. A. No. 21-2338 (RDM), 2024 WL 3741438, at *6 (D.D.C. July 1, 2024), the Court will calculate prejudgment interest beginning upon his capture, <u>see</u> <u>Reed v. Islamic Republic of Iran</u>, 845 F. Supp. 2d 204, 215 (D.D.C. 2012); <u>Fritz v. Islamic Republic of Iran</u>, 324 F. Supp. 3d 54, 64 (D.D.C. 2018).

of the year that had passed by the precise date of the attack.  Id.; see also id. at *55 n.46 (detailing the calculation method).  That method results in a multiplier of 1.409.

Including prejudgment interest, then, the following amounts represent each plaintiff's compensatory award: $2.1135 million to Fakhoury's estate; $1.409 million to Micheline Elias; $1,056,750 to each child.  That brings the total compensatory award to $7,749,500.

## IV.    Punitive Damages

The plaintiffs' final request is for $150 million in punitive damages.  See Mot. for Default J. at 26–29.  The cases they cite for this figure present circumstances far afield from this case, and the requested punitive damages would be disproportionate to the $5.5 million (plus prejudgment interest) total compensatory award.

Nonetheless, some punitive damages are appropriate.  These damages, which are appropriate in cases involving "outrageous conduct," aim to "punish and deter" the defendant.  Wang, 2025 WL 785736, at *16 (quoting Hekmati, 278 F. Supp. 3d at 166).  Courts consistently award punitive damages in hostage cases because "holding a man hostage . . . to gain leverage over the United States is outrageous, deserving of punishment, and surely in need of deterrence."  Id. (cleaned up).

Punitive damage awards in this District have taken three main forms.  The first, rarely appropriate except in cases involving "exceptionally deadly attacks," multiplies the foreign state's annual expenditures on terrorism by a factor of three to five.  See id. (internal quotation marks omitted).  The second method—for which the plaintiffs here advocate—awards a flat $150 or $300 million per family.  Id.  While this method boasts predictability, by the same token its rigidity "limits a judge's discretion to tailor a punitive award appropriate to the magnitude of the underlying injury" and can result in disproportionate punitive damages.  Abedini v. Gov't of

Islamic Republic of Iran, 422 F. Supp. 3d 118, 142 (D.D.C. 2019); see also Selig v. Islamic Republic of Iran, 573 F. Supp. 3d 40, 76–77 (D.D.C. 2021). The third method matches punitive damages to total compensatory damages, or sometimes multiplies compensatory damages by a factor determined by the Court. Id.; see also, e.g., Ewan, 466 F. Supp. 3d at 251.

The third method—pegging punitive damages to compensatory damages—is often deployed in cases like this one, involving isolated (though awful) instances of hostage-taking. See, e.g., Wang, 2025 WL 785736, at *16; Kar, 2022 WL 4598671, at *22; Abedini, 422 F. Supp. 3d at 142; Hekmati, 278 F. Supp. 3d at 167. This method shares the other methods' virtue of predictability, but simultaneously avoids a grossly disproportionate punitive damages award. See Abedini, 422 F. Supp. 3d at 142. The Court has little trouble concluding that this is the appropriate measure of punitive damages in this case and therefore will award $7,749,500 in punitive damages, to be divided among the plaintiffs in direct proportion to their compensatory awards. See Selig, 573 F. Supp. 3d at 77; Ewan, 466 F. Supp. 3d at 252 & n.4.

## Conclusion

For the above reasons, the Court will award the following amounts as damages. To the estate of Amer Fakhoury, $2.1135 million in compensatory damages and an equal amount in punitive damages. To Micheline Elias, $1.409 million in compensatory damages and an equal amount in punitive damages. To Amanda Fakhoury, $1,056,750 in compensatory damages and an equal amount in punitive damages. To Guila Fakhoury, $1,056,750 in compensatory damages and an equal amount in punitive damages. To Macy Fakhoury, $1,056,750 in compensatory damages and an equal amount in punitive damages. To Zoya Fakhoury, $1,056,750 in compensatory damages and an equal amount in punitive damages. A separate order will issue on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: May 1, 2025